No. 25-12241

# United States Court of Appeals for the Eleventh Circuit

MORIAH AHARON,
JORDAN G. KUPPINGER,
DAMON J. DETESO,
ROSANNA CARUSO,
CHRISTOPHER PAYTON, ET AL.,
*Plaintiffs-Appellees,*

v.

CHINESE COMMUNIST PARTY, ET AL.,
*Defendants,*

PETROCHINA INTERNATIONAL (AMERICA), INC.,
*Defendant-Appellant.*

Appeal from the United States District Court for the Southern District of Florida, No. 20-cv-80604-RKA

**BRIEF FOR APPELLANT**

Pravin Patel
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131-3368
(305) 577-3180
pravin.patel@weil.com

*Counsel for Appellant PetroChina International (America), Inc.*

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, PetroChina International (America), Inc. ("PCIA") states PetroChina International (America), Inc. is not a publicly traded corporation and is wholly owned by its parent company, PetroChina International Co., Ltd, which is also not a publicly traded company.

The undersigned counsel certifies that the following persons have or may have an interest in the outcome of this case or appeal:

1. Aharon, Moriah – Plaintiff in district court proceedings;
2. Kuppinger, Jordan G.– Plaintiff in district court proceedings;
3. Deteso, Damon J. – Plaintiff in district court proceedings;
4. Caruso, Rosanna – Plaintiff in district court proceedings;
5. Payton, Christopher – Plaintiff in district court proceedings;
6. Angioletti, Lee – Plaintiff in district court proceedings;
7. Manning, Mariangella – Plaintiff in district court proceedings;
8. Vasquez, Lynnora – Plaintiff in district court proceedings;
9. Madden, Rebecca – Plaintiff in district court proceedings;
10. The People's Republic of China – Defendant in district court proceedings;
11. The Chinese Communist Party – Defendant in district court proceedings;
12. Altman, Roy K. – United States District Judge, United States District Court, Southern District of Florida;

13. Reinhart, Bruce R. – Magistrate Judge, United States District Court, Southern District of Florida;

14. Patel, Pravin R. – Counsel for Defendant–Appellant PetroChina International (America), Inc.;

15. Guernsey Jr., Daniel P. – Counsel for Defendant–Appellant PetroChina International (America), Inc.;

16. Katzen, Alli G. – Counsel for Defendant–Appellant PetroChina International (America), Inc.;

17. Weil, Gotshal & Manges LLP – Counsel for Defendant–Appellant PetroChina International (America), Inc.;

18. Moore, Matthew T. – Counsel for Plaintiffs;

19. Duffy, Vincent J. – Counsel for Plaintiffs;

20. The Law Offices of Berman & Berman, P.A. – Counsel for Plaintiffs;

21. PetroChina International Co., Ltd – Appellant's parent corporation;

22. PetroChina Company Limited – Appellant's grandparent corporation;

23. China National Petroleum Corporation – Appellant's great grandparent corporation;

24. PetroChina International (Canada) Trading, Ltd. – Appellant's subsidiary corporation; and

25. PetroChina International (Brazil) Trading, Ltda. – Appellant's subsidiary corporation.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant PCIA respectfully requests oral argument pursuant to Federal Rule of Appellate Procedure 34(a)(1) and Rule 28-1(c) of the Eleventh Circuit Rules. This appeal involves a determination of whether the People's Republic of China's and the Chinese Communist Party's (collectively, the "Chinese Government") response to and handling of COVID-19 falls within the commercial activity exception of the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 et seq. (the "FSIA"), such that the Chinese Government can be haled into court in the United States. This is an issue of first impression within this Circuit with significant international implications. Counsel believes oral argument would aid the Court in further understanding the novel issues presented by this appeal.

# TABLE OF CONTENTS


**Page**

Certificate of Interested Persons and Corporate Disclosure Statement ........ C1

Statement Regarding Oral Argument ........ i

Statement of Subject-Matter and Appellate Jurisdiction ........ ix

Introduction ........ 1

Statement of the Issues ........ 6

Statement of the Case ........ 6

A. Statement of Facts ........ 6

B. Procedural History ........ 10

1. Plaintiffs represented that the case cannot proceed without the Chinese Government. ........ 10

2. The district court relied on Plaintiffs' representation that the case would end if the Chinese Government were immune. ........ 11

3. The district court held certain claims are not barred by sovereign immunity. ........ 14

C. Standard of Review ........ 16

Summary of the Argument ........ 16

Argument ........ 18

I. PCIA Has Standing to Appeal the FSIA Order. ........ 18

A. The FSIA Order Is Adverse to PCIA. ........ 19

B. A Favorable Ruling on Appeal Will Likely Redress PCIA's Injury by Resulting in Dismissal of the Entire Case ........ 24

II. The Chinese Government Is Immune Under the FSIA Because Plaintiffs' Suit Does Not Fall Within the Commercial Activity Exception ........ 26

A. Plaintiffs' Suit Is Based on the Chinese Government's Sovereign Regulatory Response to COVID-19. ........ 28

1. Courts must consider the gravamen of the suit, rather than look claim-by-claim ........ 28

2. The gravamen of the suit is the Chinese Government's alleged mishandling of COVID-19. .... 30

3. The district court and Eighth Circuit in *Bailey* mistakenly looked to the gravamen of each count, rather than the gravamen of the suit. .... 33

B. Plaintiffs' Suit Is Not in Connection with Commercial Activity. .... 36

1. The Chinese Government's sovereign regulatory response to COVID-19 is not in connection with commercial activity. .... 36

2. The alleged PPE stockpiling, even though not the gravamen of Plaintiffs' suit, is not in connection with commercial activity... 39

C. There Was No Direct Effect in the United States. .... 47

1. The alleged actions by the Chinese Government, in China, did not have a direct effect in the United States .... 49

2. The PPE-related allegations did not cause a direct effect in the United States. .... 51

Conclusion .... 55

Certificate of Compliance .... 57

Certificate of Service .... 58

# TABLE OF CITATIONS

**Page(s)**

**Cases**

*Africa Growth Corp. v. Republic of Angola*,
2023 WL 3590409 (11th Cir. May 23, 2023) .............................. 30, 32

*Agudas Chasidei Chabad v. Russian Federation*,
110 F.4th 242 (D.C. Cir. 2024)........................................ 8, 20, 21, 25

*Araya-Solorzano v. Gov't of the Republic of Nicaragua*,
562 F. App'x 901 (11th Cir. 2014).................................................. 48

*Missouri ex rel. Bailey v. People's Republic of China*,
90 F.4th 930 (8th Cir. 2024) ...................... 14-16, 33-35, 45-47, 49-54

*Beg v. Islamic Republic of Pakistan*,
353 F.3d 1323 (11th Cir. 2003)...................................... 30, 36, 38, 45

*Broidy Cap. Mgmt., LLC v. Qatar*,
982 F.3d 582 (9th Cir. 2020)........................................................... 34

*Butler v. Sukhoi Co.*,
579 F.3d 1307 (11th Cir. 2009).................................................. ix, 27

*Calzadilla v. Banco Latino Internacional*,
413 F.3d 1285 (11th Cir. 2005)........................................................ 16

*CC/Devas (Mauritius) Ltd. v. Antrix Corp.*,
145 S. Ct. 1572 (2025) ..................................................................... 48

*Chisholm & Co. v. Bank of Jamaica*,
643 F. Supp. 1393 (S.D. Fla. 1986).................................................. 39

*Cicippio v. Islamic Republic of Iran*,
30 F.3d 164 (D.C. Cir. 1994) ........................................................... 42

*Czyzewski v. Jevic Holding Corp.*,
580 U.S. 451 (2017) ......................................................................... 23

*Deposit Guar. Nat'l Bank v. Roper*,
445 U.S. 326 (1980) .......... 21

*Devengoechea v. Bolivarian Republic of Venezuela*,
889 F.3d 1213 (11th Cir. 2018) .......... 16, 28, 43, 46

*Diverse Power, Inc. v. City of LaGrange*,
934 F.3d 1270 (11th Cir. 2019) .......... ix

*Eisenberg v. People's Republic of China*,
2022 WL 1591541 (D. Mass. May 19, 2022) .......... 14, 36

**Guevara v. Republic of Peru*,
608 F.3d 1297 (11th Cir. 2010) .......... 47, 52-53

*Guirlando v. T.C. Ziraat Bankasi A.S.*,
602 F.3d 69 (2d Cir. 2010) .......... 48, 51

*Gulf Coast Fans, Inc. v. Midwest Elecs. Imps., Inc.*,
740 F.2d 1499 (11th Cir. 1984) .......... 22

*Hendricks v. Bank of Am., N.A.*,
408 F.3d 1127 (9th Cir. 2005) .......... 20

*Honduras Aircraft Registry v. Government of Honduras*,
129 F.3d 543 (11th Cir. 1997) .......... ix, 39

*Jacobson v. Massachusetts*,
197 U.S. 11 (1905) .......... 1, 37

*Knight v. Alabama*,
14 F.3d 1534 (11th Cir. 1994) .......... 19

*Laker Airways, Inc. v. British Airways, PLC*,
182 F.3d 843 (11th Cir. 1999) .......... 24

*MOL, Inc. v. Peoples Republic of Bangladesh*,
736 F.2d 1326 (9th Cir. 1984) .......... 40

*N.J. Dep't of Env't Prot. v. Am. Thermoplastics Corp.*,
974 F.3d 486 (3d Cir. 2020) .......... 20, 23

*Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen., Fla. Dep't of Health*,
50 F.4th 1126 (11th Cir. 2022) ........................................................ 37

**OBB Personenverkehr AG v. Sachs*,
577 U.S. 27 (2015) ........................................................2-3, 16, 28-33,

*Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel*,
657 F.3d 1159 (11th Cir. 2011) ........................................... 42-44, 46

*Parker v. Brown*,
317 U.S. 341 (1943) ........................................................................ 45

*Republic of Argentina v. Weltover, Inc.*,
504 U.S. 607 (1992) ............................................ 2, 27, 36, 39, 47, 55

*Rodriguez v. Republic of Costa Rica*,
139 F. Supp. 2d 173 (D.P.R. 2001) .................................................. 34

*S & Davis Int'l, Inc. v. Yemen*,
218 F.3d 1292 (11th Cir. 2000) ......................................................... ix

*S. Mills, Inc. v. Nunes*,
586 F. App'x 702 (11th Cir. 2014).................................................... 23

**Saudi Arabia v. Nelson*,
507 U.S. 349 (1993) ................................................. 28-31, 34, 38, 41

*Sequeira v. Republic of Nicaragua*,
815 F. App'x 345 (11th Cir. 2020)..................................................... 26

*Tamiami Partners Ltd. ex rel. Tamiami Dev. Corp. v. Miccosukee Tribe of Indians of Fla.*,
63 F.3d 1030 (11th Cir. 1995) ........................................................... ix

*Tenn. Valley Auth. v. U.S. EPA*,
278 F.3d 1184 (11th Cir. 2002) ................................................ 24, 25

*Todorov v. DCH Healthcare Auth.*,
921 F.2d 1438 (11th Cir. 1991) ........................................................ 45

*United States v. Pavlenko*,
921 F.3d 1286 (11th Cir. 2019) .................................................. 19, 24

*United States v. Weinlein*,
109 F.4th 91 (2d Cir. 2024) ............................................................ 19

*United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*,
33 F.3d 1232 (10th Cir. 1994) .......................................................... 48

*Upton v. Empire of Iran*,
459 F. Supp. 264 (D.D.C. 1978) ....................................................... 48

**Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*,
946 F.3d 120 (2d Cir. 2019) ............................................... 18, 21, 25

*Vera v. Republic of Cuba*,
651 F. App'x 22 (2d Cir. 2016) ......................................................... 21

**Wolff v. Cash 4 Titles*,
351 F.3d 1348 (11th Cir. 2003) .......................................... 18, 19, 20

**Statutes**

28 U.S.C. § 1291 ............................................................................... xi

28 U.S.C. § 1331 ............................................................................... xi

28 U.S.C. § 1604 ............................................................................... 26

28 U.S.C. § 1605(a)(2) ................................................................ 27, 39, 47

28 U.S.C. § 1608(a) ........................................................................... 10

42 U.S.C. § 247d-6b ....................................................................... 4, 40

42 U.S.C. § 6234 ................................................................................ 4

National Defense Authorization Act,
Pub. L. No. 110-181, 122 Stat. 3 (2208) .......................................... 42

**Other Authorities**

Exec. Order No. 13911, 85 Fed. Reg. 18403 (2020) ............................. 37

Exec. Order No. 13994, 86 Fed. Reg. 7189 (2021) ............................... 37

Compl., *Missouri v. People's Republic of China*,
2020 WL 1931343 (E.D. Mo. Apr. 21, 2020) .............................. 35, 53

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

The district court had subject-matter jurisdiction over Plaintiffs' claims against PCIA pursuant to 28 U.S.C. § 1331. The parties dispute whether the district court had jurisdiction over claims against the Chinese Government, as described herein. This Court has jurisdiction under 28 U.S.C. § 1291. It is well-settled that an order denying a motion to dismiss on grounds of sovereign immunity is a "final" order that is appealable under the collateral order doctrine. *Butler v. Sukhoi Co.*, 579 F.3d 1307, 1311 (11th Cir. 2009); *S & Davis Int'l, Inc. v. Yemen*, 218 F.3d 1292, 1297 (11th Cir. 2000) (citing *Honduras Aircraft Registry v. Government of Honduras*, 129 F.3d 543, 545 (11th Cir. 1997)); *Diverse Power, Inc. v. City of LaGrange*, 934 F.3d 1270, 1272 n.1 (11th Cir. 2019) ("[D]enials of immunity from suit—like denials of sovereign and qualified immunities—are immediately appealable under the collateral order doctrine."); *Tamiami Partners Ltd. ex rel. Tamiami Dev. Corp. v. Miccosukee Tribe of Indians of Fla.*, 63 F.3d 1030, 1050 (11th Cir. 1995). As set forth more fully below, PCIA has standing to appeal that final order. The final order was entered May 27, 2025, and PCIA timely appealed on June 26, 2025.

## INTRODUCTION

The district court erred in denying sovereign immunity to the Chinese Government for its response to the spread of COVID-19. A nation's response to the spread of a pathogen is part of the core governmental prerogative of protecting "the public health and the public safety." *Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905). Yet the district court has now allowed a putative nationwide class of medical providers to seek damages, under American common law and antitrust law, for personal injuries allegedly caused by the Chinese Government's response to a once-in-a-hundred-years pandemic. PCIA—the only non-governmental Defendant, which appears only a few times in the Amended Complaint—is dragged along due to these claims continuing against the Chinese Government. Straightforward application of the FSIA prevents Plaintiffs from haling the Chinese Government into a United States court on such claims—and helps ensure that the United States will not reciprocally be haled into a foreign court on similar claims.

Plaintiffs invoke the third clause of the FSIA's "commercial activity" exception to sovereign immunity, but that exception applies only if the Chinese Government's conduct was both in connection with a commercial activity and had a direct effect in the United States. When determining whether conduct is commercial, courts consider the "particular conduct"

that constitutes the "gravamen" of the entire suit, in order to prevent plaintiffs from artfully pleading narrow claims to circumvent sovereign immunity. *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 28, 35 (2015). The inquiry focuses on the "acts that actually injured" the plaintiffs. *Id.* If those acts are sovereign, rather than commercial, in nature, then the exception does not apply. Sovereign conduct is generally that which private parties do not engage in, whereas commercial activities are "the types of actions by which a private party engages in trade and traffic or commerce." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (cleaned up).

The Chinese Government is immune here. The gravamen of the suit is the Chinese Government's alleged mishandling of the response to COVID-19, which involved conduct that private players do not engage in. For example, Plaintiffs allege the Chinese Government caused COVID-19 to spread by controlling communications with its citizens, permitting public holiday events to take place, "shut[ting] down" an entire city, and managing communications with other foreign nations. (Doc. 19 at 31–32, 36).[1] All of those acts are part of the Chinese Government's response to and handling of a public-health threat. That is precisely sovereign activity

[1] Citations to "Doc." refer to the docket number in the district court. Page references refer to the page number in the header generated by the district court's electronic filing system.

that only a government can undertake, not commercial activity that private players in the market engage in. The United States courts cannot sit in judgment of these choices by the Chinese Government.

Contrary to Supreme Court precedent requiring consideration of the gravamen of the suit as a whole, the district court extended an errant Eighth Circuit decision[2] to find that, although China was immune from Plaintiffs' tort claims (Counts I–V), which focus on the alleged response to COVID-19, China was not immune from Plaintiffs' antitrust claims (Counts VI–IX), which purport to focus on so-called "hoarding" of personal protective equipment ("PPE"). Slicing and dicing these claims was error. *Sachs*, 577 U.S. at 35 ("Rather than individually analyzing each of [Plaintiffs'] causes of action, we zero[] in on the core of their suit."). Viewing the suit as a whole, the core conduct at issue is the Chinese Government's response to COVID-19.

Regardless, even taken on their own, the PPE-related allegations still constitute sovereign conduct. What Plaintiffs refer to as "hoarding" PPE is simply a derisive label for a nation's efforts to create a strategic reserve of medical supplies in response to a public-health crisis. Creating such a stockpile is sovereign conduct, not commercial conduct. Indeed, the

[2] *Missouri ex rel. Bailey v. People's Republic of China*, 90 F.4th 930 (8th Cir. 2024).

United States itself maintains such strategic stockpiles—including the "Strategic National Stockpile" of medical equipment that includes "personal protective equipment." 42 U.S.C. § 247d-6b(a)(1); *see also* 42 U.S.C. § 6234 (codifying the United States' practice of maintaining a "Strategic Petroleum Reserve"). If maintaining such a supply of medical supplies during a public health crisis is not sovereign activity, then the United States could be subject to suit in other countries for harms allegedly arising from its own maintenance of its strategic supplies.

Notably, Plaintiffs do not only allege that the Chinese Government procured supplies to combat the spread of disease (a sovereign function), but also that the Chinese Government engaged in other conduct that only a government—not a private player—could undertake: blocking exports; regulating trade; and using police powers to suppress information and force others abroad to collect PPE. (Doc. 19 at 36–39). Thus, even the PPE-related allegations show that the gravamen of the suit involves sovereign conduct, and the analysis ends there: FSIA immunity applies.

But even if any of the Chinese Government's alleged conduct could be considered commercial, it lacks the required *direct* effect in the United States. The chain of causation between the alleged hoarding of particular masks in China and a particular person contracting COVID-19 in the United States is incredibly attenuated. Countless intervening events led

to individuals with COVID-19 arriving in the United States and the disease spreading from person to person once in the country so as to harm Plaintiffs. And countless *more* factors affected the availability and cost of PPE in the United States.

PCIA has standing to raise the Chinese Government's immunity on appeal because the district court's order is adverse to PCIA's interests. If the Chinese Government is immune, the entire case—including the claims against PCIA—will likely be dismissed. Indeed, Plaintiffs represented to the district court on multiple occasions that they "don't think that the case can proceed" without the Chinese Government and would "probably end this case" if the Chinese Government were dismissed. (Doc. 97 at 5:22–6:10); (Doc. 113 at 7:9–20). According to Plaintiffs, the Chinese Government is "a vital part of [their] allegations." (Doc. 97 at 5:22–6:10). Therefore, by Plaintiffs' own telling, if the Chinese Government is immune, the entire case will likely come to an end. That is enough to give PCIA standing to appeal in China's absence.

This Court accordingly should reverse the district court's finding that Counts VI–IX fall within the commercial activity exception of the FSIA, thus dismissing all claims against the Chinese Government, and remand for further proceedings.

## STATEMENT OF THE ISSUES

1. Whether PCIA has standing to challenge the district court's denial of sovereign immunity to the Chinese Government, when a finding of sovereign immunity would likely lead to dismissal of the entire lawsuit, including the claims against PCIA.

2. Whether the FSIA bars Counts VI–IX of Plaintiffs' Amended Complaint against the Chinese Government because the Chinese Government's response to COVID-19, including any stockpiling of PPE, was sovereign activity that did not fit within the FSIA's commercial activity exception.

## STATEMENT OF THE CASE

### A. Statement of Facts

This case is a putative nationwide class action on behalf of medical providers in the United States who suffered personal injury because the Chinese Government's response to COVID-19 allegedly prevented them from procuring proper or adequate PPE, which led to the contraction, or fear of contraction, of COVID-19.

The Amended Complaint attempts, in places, to paint the case as one of "hoarding and stockpiling [PPE]; forbidding factories … from exporting PPE to the United States; and causing shortages and artificially inflated pricing of PPE." (Doc. 19 at 2). But the overwhelming majority of Plain-

tiffs' allegations center around the Chinese Government's alleged mishandling of COVID-19. Indeed, Plaintiffs dedicate almost 100 paragraphs to the origins of COVID-19 and alleged cover-up of the virus. (Doc. 19 at 2, 8–32).

Plaintiffs allege that COVID-19 was created in 2013 as part of "bioweapons research," in a Wuhan lab. (Doc. 19 at 11). They allege that COVID-19 was either intentionally released, escaped through infected lab employees or through animals used in the lab that were later sold in Wuhan animal markets, or "escaped/leaked in some other intentional, reckless, or negligent way." (Doc. 19 at 12–15).

Plaintiffs allege that, within weeks of its inception, the Chinese Government was aware of the dangers and transmissibility of COVID-19. (Doc. 19 at 16–19). But Plaintiffs allege that the Chinese Government censored doctors and others who allegedly tried to share information about COVID-19. (Doc. 19 at 20–25). Specifically, they allege that "[b]y January 15th [2020] … [the Chinese Government] already knew that [it] had a deadly virus that easily passed human-to-human and that an epidemic could easily become a pandemic." (Doc. 19 at 15). According to Plaintiffs, five days later on January 20, 2020, the Chinese Government began providing information about COVID-19 to the international community, such as its genome sequence. (Doc. 19 at 29, 31–32).

In Plaintiffs' view, if the Chinese Government "warn[ed] the world" about the effects and transmissibility and effects of COVID-19 just weeks before they did, "***95% of infections could have been prevented.***" (Doc. 19 at 32) (emphasis in original).

"Against this backdrop," (Doc. 116 at 9), Plaintiffs allege that the Chinese Government stockpiled PPE by buying "the world's inventory of PPE" and "prevent[ing] [China's] factories from exporting PPE," (Doc. 19 at 36). It allegedly "refus[ed] to make [its] trade logs public for months." (Doc. 19 at 36). The Chinese Government's stockpiling efforts also purportedly included invoking Military-Civil Fusion, which is China's alleged control over its citizens and "ex-pats" in order to "enlist[] employees at Chinese owned businesses in other countries, including the United States, to scour stores and suppliers in their area for masks." (Doc. 19 at 37–38).

Plaintiffs bring PCIA into the lawsuit in a few scattered paragraphs. (Doc. 19 at 2, 38–39, 41, 49–50, 53–55). They allege that the Chinese Government forced PCIA employees to go to unidentified Home Depot and Lowe's stores in Houston, Texas, to purchase N-95 masks and ship them to China. (Doc. 19 at 38–39). But Plaintiffs do not contend that they tried to buy N-95 masks at those stores.

Plaintiffs nonetheless assert that, because of Defendants' alleged actions, they were unable to procure adequate PPE, which in turn allegedly

caused personal injury from contracting (or fear of contracting) COVID-19. (Doc. 19 at 3–5, 41).

In terms of pled injuries, which informs the FSIA analysis, Plaintiffs Aharon, Caruso, Angioletti, and Manning allege they contracted COVID-19. (Doc. 19 at 3–4). Plaintiffs Kuppinger, Deteso, Vasquez, and Madden allege only that they feared contracting COVID-19. (Doc. 19 at 3–5). Plaintiff Payton does not allege even that he feared contracting COVID-19. (Doc. 19 at 4). While Plaintiffs state in conclusory fashion that they have suffered "economic harms," (Doc. 19 at 46–47, 48–50), they never meaningfully substantiate such harms. Plaintiffs generally allege that "[w]hen PPE is available, it is at highly inflated prices over market rates before the pandemic," (Doc. 19 at 34), but they never tie this allegation to any harm to any Plaintiff. Instead, this allegation is directed toward explaining why medical providers allegedly lacked PPE and were thus at "[s]erious [r]isk" of contracting COVID-19. (Doc. 19 at 34). The class definition reinforces this point by including individuals who were "unable to procure" PPE and plainly suffered no economic harm.

No Plaintiff alleges that they paid more for PPE than they otherwise would have—or that they even purchased PPE at all.

## B. Procedural History

### 1. Plaintiffs represented that the case cannot proceed without the Chinese Government.

Plaintiffs took three years to serve the Chinese Government pursuant to 28 U.S.C. § 1608(a). On April 3, 2023, Plaintiffs received a letter from the Ministry of Foreign Affairs of the People's Republic of China rejecting service and stating that this lawsuit violated "the principle of sovereign immunity in international law and [did] not conform to the United States' own 'Foreign Sovereign Immunities Act.'" (Doc. 84-1 at 13).

Around five months later, the district court held a status conference regarding Plaintiffs' service efforts. (Doc. 97). During the status conference, the district court and Plaintiffs' counsel had the following exchange:

> [THE COURT:] You want to try to convince me that [the Chinese Government has] been served and then, what, pursue default judgment procedures against them?
> [COUNSEL]: That would be the normal course.
> THE COURT: I mean, it would if I agree with you that they've been served … ***I was trying to persuade you to let them go and focus on the defendant who's here so that we could have a regular litigation on the merits …***
> [COUNSEL]: ***Well, I don't think that the case can proceed without the PRC and the CCP. They are a vital part of our allegations and what we believe happened that caused the pandemic – or caused the issue of hoarding the PPE.***

(Doc. 97 at 5:22–6:10) (emphasis added). The district court later sought confirmation from Plaintiffs' counsel: "[Y]ou mentioned earlier that the

case doesn't really make sense without these defendants. Am I understanding what you said correctly?" (Doc. 97 at 7:8–10). Plaintiffs' counsel responded: "Yes, sir." (Doc. 97 at 7:11). The district court confirmed again:

> [THE COURT]: So to your mind, it doesn't make sense to proceed against the defendant who's here, unless I am going to make a finding that these other defendants were properly served and are properly here as well. Is that correct?
> [Counsel]: Yes, sir.

(Doc. 97 at 7:12–17).

Only after "hearing that," did the district court state what "makes the most sense … [is] to have [Plaintiffs] file [their] motion for default." (Doc. 97 at 7:18–25). The district court proposed that, rather than follow the "normal" process for obtaining a default judgment, Plaintiffs file a motion addressing only whether service had been effectuated. (Doc. 97 at 14:1–20). According to the district court, this was "a more efficient way to handle it" because if the district court "den[ied] that motion, then we probably never need to get to any of the other things." (Doc. 97 at 14:6–16).

Plaintiffs filed a motion to find that service had been effectuated. (Doc. 101). PCIA took no position on the motion. (Doc. 101 at 6).

### 2. The district court relied on Plaintiffs' representation that the case would end if the Chinese Government were immune.

At a subsequent hearing on October 20, 2023, a similar exchange ensued:

> THE COURT: … Let's assume … I find that the [Chinese Government is] not properly here, have you decided what you do with PetroChina America?
> [COUNSEL]: I have -- I would think that we would probably end this case --
> THE COURT: Understood --
> [COUNSEL]: -- but I have not --
> THE COURT: -- you don't need to say any more.
> [COUNSEL]: -- authority --
> THE COURT: I think I get it.

(Doc. 113 at 7:9–20).

The district court then suggested that the case proceed to default judgment against the Chinese Government and asked to hear from PCIA. (Doc. 113 at 7:22–8:2). PCIA stated that, from an "efficiency and resource conservation perspective," the parties should file standalone briefing on whether the Chinese Government is immune under the FSIA. (Doc. 113 at 8:4–19). When asked whether PCIA would file any papers related to the issue of immunity, PCIA advised that it was considering doing so because, while PCIA would "not [be] filing obviously a response on behalf of the [Chinese Government]," the "FSIA-related immunity briefing has a very critical impact on how this case could or could not proceed, as Your Honor and [Plaintiffs' counsel] were just talking about." (Doc. 113 at 8:22–9:2). PCIA reiterated its position, stating that "my client's vested interest

is … if there's not subject matter jurisdiction as [Plaintiffs' counsel] articulated, this is either a very, very different case or it would be outright dismissed as it relates to my client." (Doc. 113 at 9:12–20).

After hearing from PCIA, the district court and parties agreed on next steps:

> THE COURT: So, what you're saying is you'd rather there be like a first phase that's like –
> [PCIA COUNSEL]: Yes, Your Honor.
> THE COURT: -- a motion for default judgment or something on the question of FSIA jurisdiction only, and then you get a chance to respond, and then he replies, and then maybe we have a hearing with some evidence about that, and then I decide it. ***And if I deny it, case is over***; if I grant it, then we can move to the second phase of briefing on personal jurisdiction, venue, and the merits. Is that sort of how you foresee it?
> [PCIA COUNSEL]: Yes, Your Honor.
> THE COURT: Okay. Mr. Moore, any problem with that bifurcation?
> [PLAINTIFFS' COUNSEL]: None at all, Your Honor. I agree with that.

(Doc. 113 at 9:24–10:11) (emphasis added).

The district court then found that Plaintiffs effectuated service, directed Plaintiffs' counsel to file a notice of clerk's default, and stated that it would enter an order "directed [only] to the question of subject matter jurisdiction." (Doc. 113 at 13:5–11).

### 3. The district court held certain claims are not barred by sovereign immunity.

On December 7, 2023, Plaintiffs filed a Motion for the Court to Find Subject Matter Jurisdiction Under the FSIA for the Purposes of Default Final Judgment. (Doc. 116) (the "FSIA Motion"). In relevant part, Plaintiffs argued that their claims fall within the commercial activity exception to sovereign immunity. (Doc. 116 at 11–17).

After Plaintiffs filed the FSIA Motion, a panel of the Eighth Circuit issued a 2-1 decision in *Missouri ex rel. Bailey v. People's Republic of China*, 90 F.4th 930 (8th Cir. 2024). *Bailey* was brought by the Missouri Attorney General, on behalf of the State of Missouri, against the Chinese Government and state-operated Chinese agencies. Missouri alleged that the Chinese Government created and covered up COVID-19 while hoarding PPE, and the Eighth Circuit permitted certain claims to proceed. *Id.* at 934.[3] PCIA was not a party in *Bailey*.

Seeking to protect its own interests, PCIA filed a response to the FSIA Motion. (Doc. 122). PCIA confirmed that it was not arguing on behalf of the Chinese Government, but rather because, "based on the current allegations" and "statements made by counsel for Plaintiffs," "if the Court

[3] *Bailey* departed from other courts that found the Chinese Government to be immune in COVID-19 cases. *See Eisenberg v. People's Republic of China*, 2022 WL 1591541, at *5 (D. Mass. May 19, 2022).

finds that it lacks subject matter jurisdiction over the [Chinese Government] and dismisses the claims against [it], it will be case dipositive for [PCIA] as well." (Doc. 122 at 7–8).

On May 27, 2025, the district court held that it had jurisdiction over some, but not all, of Plaintiffs' claims against the Chinese Government. (Doc. 145) (the "FSIA Order"). Relevant here, the district court recognized "tension" between *Bailey* and Eleventh Circuit precedent, but it found *Bailey* persuasive and held that: (1) Counts I–V[4] fall *outside* of the commercial activity exception, meaning the Chinese Government is immune from these claims, but (2) Counts VI–IX[5] fall *within* the commercial activity exception, meaning the Chinese Government is not immune from these claims. Accordingly, the district court dismissed Counts I–V for lack of jurisdiction, but permitted Counts VI–IX to proceed.

PCIA timely appealed on June 26, 2025. (Doc. 148).

---

[4] Count I (negligence), Count II (intentional torts of toxic battery and civil assault), Count III (negligent infliction of emotional distress), Count IV (intentional infliction of emotional distress), and Count V (civil aiding and abetting).

[5] Count VI (violation of the Sherman Act, monopolization of the mask and PPE market), Count VII (violation of the Sherman Act, attempted monopolization of the mask and PPE market), Count VIII (violation of the Sherman Act conspiracy to monopolize the mask and PPE market), and Count IX (violation of the Sherman Act unreasonable restraint of trade).

### C. Standard of Review

Determinations of subject matter jurisdiction under the FSIA are reviewed de novo. *Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1220 (11th Cir. 2018); *Calzadilla v. Banco Latino Internacional*, 413 F.3d 1285, 1287 (11th Cir. 2005).

## SUMMARY OF THE ARGUMENT

The Chinese Government is immune because Plaintiffs' suit does not fall within the FSIA's commercial activity exception. Plaintiffs' alleged harm is the contraction, or fear of contraction, of COVID-19. And Plaintiffs allege that the spread of COVID-19, and virtually all of Plaintiffs' injuries, would have been prevented had the Chinese Government not mishandled the initial outbreak. Therefore, it is clear that the gravamen of Plaintiffs' suit—the conduct that actually injured Plaintiffs—is the Chinese Government's alleged mishandling of and response to COVID-19. Coordinating a national response to an epidemic is sovereign, not commercial, activity.

It was error for the district court to follow *Bailey* and focus only on the stockpiling allegations, rather than the gravamen of Plaintiffs' suit as a whole. The Supreme Court has made clear that such a "claim-by-claim" approach is improper as it allows savvy plaintiffs to artfully plead their way into one of the FSIA's immunity exceptions. *Sachs*, 577 U.S. at 36.

That is exactly what happened here.

Even the claims related to PPE stockpiling are based on sovereign activity because the conduct at issue was the governmental regulation of trade and use of enforcement powers. Plaintiffs allege the Chinese Government achieved the stockpiling with purely governmental activities, like concealing trade logs, blocking exports, and using the threat of police action to force citizens to hoard PPE. Moreover, the alleged PPE stockpiling occurred in the *context* of the Chinese Government's response to and handling of COVID-19, which resolves any doubt that it was sovereign activity.

Regardless, none of the Chinese Government's alleged conduct could have a direct effect in the United States, which is required for the commercial activity exception to apply. "Direct" in this context is an exacting standard that requires no intervening factors between the alleged conduct and resulting harm. There were many intervening events necessary for COVID-19 to spread to and then within the United States. For example, infected individuals had to travel to the United States. Then, COVID-19 had to spread within the United States. That could have been caused by infected individuals failing to quarantine or follow stay-at-home orders. Those are all intervening factors. The impact of any alleged PPE stockpiling could only have impacted the United-States-based Plaintiffs if COVID-19, an intervening factor itself, was prevalent in the United States.

For those reasons, the district court erred in permitting Counts VI–IX to proceed against the Chinese Government.

Finally, PCIA has standing to appeal because the FSIA Order is adverse to its interests as a co-defendant, especially given that Plaintiffs have represented that the case would be dismissed entirely if the Chinese Government were found to be immune. If PCIA had "gotten the ruling it wanted on immunity" as to the Chinese Government, it is likely that "further proceedings would be foreclosed, and [PCIA] would be out of the case," so PCIA may take this appeal. *Agudas Chasidei Chabad v. Russian Federation*, 110 F.4th 242, 248 (D.C. Cir. 2024), *petition for cert. filed*, No. 24-909 (U.S. Feb. 24, 2025); *see also Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*, 946 F.3d 120, 135 (2d Cir. 2019) (recognizing that a private party had standing to appeal the issue of a sovereign's FSIA immunity because the decision on immunity was also adverse to the private party's interests).

Accordingly, this Court should find that the Chinese Government is immune from the suit as a whole, reverse the contrary order, and remand.

## ARGUMENT

### I. PCIA Has Standing to Appeal the FSIA Order.

Parties seeking to appeal a judgment or order must establish "appellate standing." *Wolff v. Cash 4 Titles*, 351 F.3d 1348, 1353 (11th Cir. 2003). Although "similar and overlapping, the doctrines of appellate standing

and trial standing are not identical." *Id.* To have appellate standing, the order must be adverse to the appellant and a favorable ruling on appeal must be likely to redress that injury. *Id.* The Court has also referenced, though not in every case, a requirement that the injury be "fairly traceable" to the adverse order. *United States v. Pavlenko*, 921 F.3d 1286, 1289 (11th Cir. 2019).

Here, all appellate-standing requirements are satisfied. As Plaintiffs have repeatedly represented, the entire case would likely be dismissed if the Chinese Government is immune. Thus, the FSIA Order is adverse to PCIA, PCIA's injury is traceable to the FSIA Order, and reversing as to Counts VI–IX would likely redress PCIA's injury.

**A. The FSIA Order Is Adverse to PCIA.**

"Because it is not generally required that a defendant have any particular 'standing' in order to be sued in a trial court, a defendant ordinarily has standing to appeal any ruling on the plaintiff's cause of action that is adverse to the defendant's interests." *Knight v. Alabama*, 14 F.3d 1534, 1555 (11th Cir. 1994). Put differently, "a litigant 'who is aggrieved by [a] judgment or order may appeal.'" *Wolff*, 351 F.3d at 1354.

"[S]tanding to appeal can be supported by abstract or slight injuries, such as *probabilistic* injury." 15A Wright & Miller's Federal Practice & Procedure § 3902 (3d ed. May 2025) (emphasis added); *see United States*

*v. Weinlein*, 109 F.4th 91, 96–97 (2d Cir. 2024) (finding appellate standing based on a "threatened harm in the form of an increased risk of future injury") (citation omitted).

A litigant can be aggrieved by an order even when it was entered against a different party. *See N.J. Dep't of Env't Prot. v. Am. Thermoplastics Corp.*, 974 F.3d 486, 492–94 (3d Cir. 2020) (holding appellant had appellate standing, even though the dispute below was between two other parties, because its rights *could* be affected by the appealed order); *Hendricks v. Bank of Am., N.A.*, 408 F.3d 1127, 1133 (9th Cir. 2005) (holding appellant "clearly satisf[ied]" appellate-standing requirements "because it was both a party of record" and affected by the challenged order, even though the order enjoined a different party); *cf. Wolff*, 351 F.3d at 1358 ("[A]ppellants' standing is questionable not because they assert third-party rights to rectify their injuries, but because they lack injuries altogether.").

Both the D.C. and Second Circuits have found that, on appeal, co-defendants (and even non-parties) can challenge an FSIA immunity determination against a foreign state. In *Agudas Chasidei Chabad*, the D.C. Circuit held that Tenex-USA, a non-party, had standing to challenge the finding that the Russian Federation's actions fell within the expropriation exception of the FSIA. 110 F.4th at 247–48. The court stated that "if

Tenex-USA had gotten the ruling it wanted … further proceedings would be foreclosed, and Tenex-USA would be out of the case." *Id.* Tenex-USA's appeal was permitted as "an effort to achieve that more favorable outcome." *Id.* In *Vera*, the Second Circuit found that a private party, BBVA, had standing to appeal the issue of whether Cuba was entitled to FSIA sovereign immunity because, if it was, the case against BBVA would be dismissed. *Vera*, 946 F.3d at 135 & n.20.[6]

Like the appealing parties in *Agudas Chasidei Chabad* and *Vera*, if PCIA's appeal is successful, the claims against PCIA will likely be dismissed, and PCIA will avoid the burdens of litigation and attendant impacts to its business. *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 327 (1980) (finding that the potential to reduce "part of the costs of litigation" is sufficient to establish appellate standing).[7]

[6] Earlier in the *Vera* case when BBVA tried to appeal the district court's turnover order and argue that Cuba was immune under the FSIA, the Second Circuit expressly stated that "[h]ad BBVA wished to appeal the denial of [Cuba's] immunity from suit, it could have appealed one or both of the" district court's previous orders resolving the issue of sovereign immunity. *Vera v. Republic of Cuba*, 651 F. App'x 22, 25 (2d Cir. 2016). That is what PCIA is doing here—immediately appealing the FSIA Order denying sovereign immunity as to the Chinese Government.

[7] Even if Plaintiffs' case somehow proceeded against PCIA, this case would be fundamentally different without the Chinese Government. There would be no default proceedings, and Plaintiffs' entire case would be supported by only *eight* paragraphs of allegations against PCIA.

Plaintiffs and the district court repeatedly recognized that the case cannot and would not proceed without the Chinese Government. Typically, it is "sound policy" to proceed against a non-defaulting defendant when there are both defaulting and non-defaulting defendants. *Gulf Coast Fans, Inc. v. Midwest Elecs. Imps., Inc.*, 740 F.2d 1499, 1512 (11th Cir. 1984). Once it became clear that PCIA was the only non-defaulting party, the district court encouraged Plaintiffs to follow that "sound policy." *Id.*; (Doc. 97 at 6:1–6). However, Plaintiffs' counsel stated, " I don't think that the case can proceed without the [Chinese Government]. [It is] a vital part of our allegations and what we believe happened that caused the pandemic—or caused the issue of hoarding the PPE." (Doc. 97 at 6:7–10).[8] In light of that representation, the district court ordered Plaintiffs to proceed with default judgment against the Chinese Government. (Doc. 97 at 7:12–22); *see* (Doc. 113 at 6:22–24) ("[T]he allegations of the complaint are intertwined between the China-based defendants and PetroChina."); (Doc. 113 at 7:9–16) ("[L]et's assume I find that the [Chinese Government is] not properly here, have you decided what you do with PetroChina America?

[8] When pressed on this point, Plaintiffs' counsel doubled down. (Doc. 97 at 7:8–17) ("THE COURT: All right. Now, you mentioned earlier that the case doesn't really make sense without these defendants. Am I understanding what you said correctly? [Counsel]: Yes, sir.").

[Counsel]: I have -- I would think that we would probably end this case[.]"); (Doc. 113 at 10:3) ("And if I deny it, case is over[.]").

If this Court reverses, Plaintiffs cannot change their tune on remand and argue that the case can proceed without the Chinese Government. (Doc. 127) (Plaintiffs arguing, without citation, that they did not admit that the case cannot proceed without the Chinese Government). "[Plaintiffs] persuaded the district court of the opposite position in moving [for default judgment against the Chinese Government], and … may not change their position 'according to the exigencies of the moment.'" *S. Mills, Inc. v. Nunes*, 586 F. App'x 702, 706 (11th Cir. 2014) (citing *Robinson v. Tyson Foods, Inc.*, 595 F.3d 1269, 1273 (11th Cir. 2010)).

Therefore, the case against PCIA will likely be dismissed on remand if the Court finds that the Chinese Government is immune.

At a minimum, the FSIA Order is adverse to PCIA's interests because it deprived PCIA of the opportunity to seek dismissal of the claims against it on the basis of the Chinese Government's immunity. *Cf. Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 463–64 (2017) ("Of course, the lawsuit—like any lawsuit—*might* prove fruitless, but the mere *possibility* of failure does not eliminate the value of the claim or petitioners' injury in being unable to bring it."); *see also N.J. Dep't of Env't Prot.*, 974 F.3d at 494 (finding appellate standing where the reversal of an order involving two

other parties would remove "a barrier" to the appellant seeking relief). In addition to their admissions regarding dismissal of the case, Plaintiffs acknowledged that the Chinese Government is "a vital part of [Plaintiffs'] allegations and what [they] believe happened that caused the pandemic—or caused the issue of hoarding the PPE." (Doc. 97 at 6:7–10). Therefore, on remand, PCIA would have at least colorable arguments that the Chinese Government is a necessary party and without it, the case should be dismissed. *Laker Airways, Inc. v. British Airways, PLC*, 182 F.3d 843, 848 (11th Cir. 1999) ("Here, Laker is alleging that BA conspired with ACL to favor BA in the slot allocation process … ACL is the only entity that can allocate slots at Gatwick Airport. Without ACL, BA would not be able to manipulate, as Laker suggests, the slot allocation process … We determine, therefore, that ACL is a necessary party.").

Therefore, because its interests are adverse to the FSIA Order, PCIA has standing to appeal.

### B. A Favorable Ruling on Appeal Will Likely Redress PCIA's Injury by Resulting in Dismissal of the Entire Case.

For appellate standing, the asserted injury need only be "likely to be redressed by a favorable judicial decision." *Pavlenko*, 921 F.3d at 1289 (citation omitted). "While redressability must not be speculative, it need only be 'likely,' not certain." *Tenn. Valley Auth. v. U.S. EPA*, 278 F.3d 1184, 1207 (11th Cir. 2002) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561

(1992)), *withdrawn in part on other grounds*, 336 F.3d 1236 (11th Cir. 2003). An order reversing the FSIA Order would likely redress PCIA's injury because, as explained above, the entire case will likely be dismissed if the Chinese Government is immune.

In addition to *Agudas Chasidei Chabad* and *Vera*, this Court's reasoning in *Tennessee Valley Authority* confirms the redressability of PCIA's injury. 278 F.3d 1184. There, this Court found that private power companies had trial standing to challenge an order issued by the EPA against a public power company, TVA, "due to the interconnectedness of their electric transmission networks with TVA's." *Id.* at 1206. The Court reasoned that TVA's compliance with EPA orders could impose costs on the private power companies and, even though those costs were not definitive or direct, they were "likely" and therefore could support standing. *Id.* at 1207.

There is similar interconnectedness here: Plaintiffs' "allegations of the complaint are intertwined between the China-based defendants and [PCIA]." (Doc. 113 at 6:22–24). And just like the EPA's orders against the TVA impacted private power companies such that they had redressable injuries, so too here, the ruling that the Chinese Government is not immune from some claims was adverse to PCIA's own interests such that a contrary ruling would redress its injury. *TVA*, 278 F.3d at 1207. Again, Plaintiffs repeatedly represented that the case likely would not or could

not proceed without the Chinese Government, and the Chinese Government is likely a necessary party. Therefore, even if indirectly, it is likely that a reversal of the district court's order on the Chinese Government's immunity will result in the case being dismissed against PCIA.

At a minimum, PCIA is aggrieved by not being able to seek dismissal of the claims against it. If this Court reverses, PCIA will have the opportunity to seek dismissal of the claims against it on remand. Therefore, the redressability requirement is satisfied.

Accordingly, PCIA has appellate standing.

## II. The Chinese Government Is Immune Under the FSIA Because Plaintiffs' Suit Does Not Fall Within the Commercial Activity Exception.

Turning to the merits, this Court should reverse the FSIA Order and hold that the Chinese Government is immune from all of the claims in the Amended Complaint. Under the FSIA, foreign states[9] are presumptively immune from suit, unless an enumerated exception applies. 28 U.S.C. § 1604. "A plaintiff who seeks to sue a foreign state has the burden of establishing subject matter jurisdiction by 'producing evidence' that one of the FSIA's sovereign-immunity exceptions applies." *Sequeira v. Republic of*

[9] It is undisputed that the Chinese Government is a foreign state under the FSIA. (Doc. 116 at 3 n.2); (Doc. 101 at 4).

*Nicaragua*, 815 F. App'x 345, 348–49 (11th Cir. 2020) (quoting *Butler*, 579 F.3d at 1312–13).

This appeal concerns whether the "commercial activity" exception applies to Plaintiffs' suit. (Doc. 145 at 11–21). The commercial activity exception permits jurisdiction when the action is based upon: (1) "commercial activity carried on in the United States by the foreign state"; (2) "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere"; or (3) "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). Only the third clause is at issue, which applies when a lawsuit is "(1) 'based … upon an act outside the territory of the United States'; (2) that was taken 'in connection with a commercial activity' of [the Chinese Government] outside this country; and (3) that 'caused a direct effect in the United States.'" *Weltover, Inc.*, 504 U.S. at 611.

This Court should reverse the district court's holding that the Chinese Government is not immune as to Counts VI–IX because: (A) the gravamen of the suit is the Chinese Government's handling of COVID-19, not the PPE-related allegations; (B) both courses of conduct constitute sovereign conduct and could not have been performed by a private party; and (C) neither course of conduct could have had a direct effect in the United

States given the vast number of intervening causes involved in the global spread of a pandemic.

### A. Plaintiffs' Suit Is Based on the Chinese Government's Sovereign Regulatory Response to COVID-19.

#### 1. Courts must consider the gravamen of the suit, rather than look claim-by-claim.

To determine whether the third clause of the commercial activity exception applies, this Court must first identify "the conduct upon which the suit is based." *Devengoechea*, 889 F.3d at 1222. That is, the Court looks at "the 'particular conduct' that constitutes the 'gravamen' of the suit, namely, "the foreign state's [alleged] 'acts that actually injured' the plaintiff." *Id.* (quoting *Sachs*, 577 U.S. at 35). The Court does not "individually analyz[e] each of the [plaintiffs'] causes of action" because such an "approach would allow plaintiffs to evade the [FSIA's] restrictions through artful pleading." *Sachs*, 577 U.S. at 35–36 (citation omitted). Regardless of how a plaintiff artfully "frames her suit," the Court is only concerned with its "foundation." *Id.*

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993), is instructive. In *Nelson*, an American company recruited plaintiff to work for a hospital in Saudi Arabia. *Id.* at 351–52. While working at the hospital, the Saudi police arrested and tortured plaintiff. *Id.* at 352–53. After his release, plaintiff sued, asserting sixteen causes of action, which fell into three buckets: (i)

intentional torts, (ii) claims related to the failure to warn, and (iii) derivative injuries. *Id.* at 353–54. Rather than look at each category of claims separately, the Supreme Court focused on the gravamen of the entire suit, which was plaintiff's alleged torture in Saudi Arabia, not the alleged failure to warn in the United States. *Id.* at 358. The alleged torture was an exercise of police power and therefore a sovereign, not commercial, act. *Id.* at 361.

*Sachs* followed this approach. There, the plaintiff purchased a Eurail pass while in the United States. 577 U.S. at 29. The plaintiff then fell while attempting to board a train in Innsbruck, Austria. *Id.* at 30. Plaintiff sued the railway, alleging that her claims were "based upon" her purchase of the Eurail pass, which was commercial activity. *Id.* at 31. She asserted various claims based on negligence, failure to warn, and breach of several implied warranties. *Id.* at 30. Declining to look "claim-by-claim" or "element-by-element," the Supreme Court found that, "[h]owever [plaintiff] frames her suit, the incident [at the train station] in Innsbruck remains at its foundation." *Id.* at 36. That incident did not satisfy the commercial activity exception. *Id.* at 38.

The Eleventh Circuit has accordingly declined to individually analyze each cause of action when considering the commercial activity exception.

Even in cases where the claims arise out of more than one allegedly wrongful act, this Court takes a holistic approach, focusing on the *core* conduct underlying the entire suit. For example, in *Africa Growth Corp. v. Republic of Angola*, 2023 WL 3590409, at *2 (11th Cir. May 23, 2023), plaintiff brought contract and quasi-contract claims, alleging the Angolan government breached a settlement agreement promising payment for expropriated property. This Court held the gravamen of the suit was the expropriation—which was sovereign conduct—and not the breach of the settlement agreement. *Id.* at *4–5; *see also Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323, 1324 (11th Cir. 2003) (applying the commercial activity inquiry to the conduct that was central to the suit even though plaintiff alleged two separate harms). Thus, artful pleading of creative causes of action does not stop this Court from focusing on the gravamen of the suit.

### 2. The gravamen of the suit is the Chinese Government's alleged mishandling of COVID-19.

Applying *Sachs* and *Nelson*, the gravamen of Plaintiffs' suit is the Chinese Government's alleged response to and mishandling of information related to the virus. The overwhelming majority of Plaintiffs' general allegations in the Amended Complaint are dedicated to the supposed origins of COVID-19 and subsequent cover-up of the virus by the Chinese Government. (Doc. 19 at 2, 8–32).

The "core" of the suit consists of the "acts that [allegedly] actually injured" Plaintiffs, *Sachs*, 577 U.S. at 35, not acts that merely "*led* to the conduct that eventually injured" Plaintiffs, *Nelson*, 507 U.S. at 358 (emphasis added). Plaintiffs' alleged injury is the contraction (or fear of contraction) of COVID-19. (Doc. 19 at 3–5). And that injury was allegedly caused by the Chinese Government's mishandling of COVID-19 in its early days. Indeed, Plaintiffs allege that the purported mishandling of COVID-19 by the Chinese Government led to 95% of COVID-19 cases reaching the United States. (Doc. 19 at 32) ("[I]f the PRC and CCP … had acted three weeks earlier—a time frame where the CCP took control of the information on the emerging problem from China CDC and silenced everyone—***95% of infections could have been prevented***.") (emphasis in original). Without the alleged mishandling of the pandemic, Plaintiffs would not have suffered any injury. Thus, the sovereign handling of COVID-19 is the gravamen of the suit.

PPE stockpiling cannot be the gravamen of the suit because it is not the core conduct responsible for Plaintiffs' alleged injuries. At most, PPE stockpiling relates only to alleged price changes. But any price changes are tangential to Plaintiffs' alleged injuries in contracting or fearing contracting COVID-19. Underscoring the tangential nature of the stockpiling

allegations to their actual injuries, Plaintiffs allege only in *conclusory* fashion that they have suffered "economic harms." (Doc. 19 at 46–50). The closest they come to explaining any economic harms appears in a few scattered paragraphs, stating that "[w]hen PPE is available, it is at highly inflated prices over market rates before the pandemic." (*E.g.*, Doc. 19 at 34, 52). But there is no allegation linking higher prices to any particular Plaintiff—indeed, Plaintiffs do not allege that they paid a premium for PPE. And, when read in context, those references to higher prices merely purport to explain why PPE access was low, which supposedly led to increased *contraction or fear of contraction*—once again, the actual alleged injury here. Like in *Africa Growth*, 2023 WL 3590409, at *7, where the Court focused on the conduct that would have actually caused the alleged injury rather than the secondary conduct put forth by the plaintiff, this Court should focus its inquiry on the conduct that is central to the alleged injuries: China's handling of COVID-19.

"However [Plaintiffs] frame[] [their] suit, [COVID-19] remains at its foundation." *See Sachs*, 577 U.S. at 35–36. Regardless, even if the Court finds the alleged PPE stockpiling is somehow the gravamen of the suit, that conduct would still fall outside of the commercial activity exception. *Infra* at Section II(B)(2).

#### 3. The district court and Eighth Circuit in *Bailey* mistakenly looked to the gravamen of each count, rather than the gravamen of the suit.

The district court mistakenly found that "***the 'gravamen' of Counts VI–IX*** is that the Plaintiffs were harmed by the Defendants' 'commercial activities'—*viz.* the hoarding of the world's PPE supply." (Doc. 145 at 18) (emphasis added). In doing so, the district court improperly differentiated between Counts I–V (tort claims) and Counts VI–IX (antitrust claims), notwithstanding that the core underlying injury (mishandling the response to COVID-19 and resulting spread of the disease) is the same. (Doc. 145 at 3).

The district court's approach was based on the Eighth Circuit's decision in *Bailey*, which also analyzed the plaintiff's tort claims separately from the antitrust claims. 90 F.4th at 937–38 (analyzing plaintiff's claims that "target the alleged 'malfeasance and deception' behind the spread of COVID-19[,]" but noting that "[t]he hoarding claim is different"). That was improper.

*First*, the Supreme Court rejected the "claim-by-claim" approach because it allows a plaintiff to overcome the FSIA's restrictions through "artful pleading." *Sachs*, 577 U.S. at 36. That is exactly what the plaintiff achieved in *Bailey*, and what Plaintiffs are attempting here. In *Bailey*, the plaintiff artfully pled certain of their claims as relating to PPE stockpiling

by zooming in on only one of the alleged actions of the Chinese Government in response to COVID-19. But as one court aptly noted, "there is no logical limit (other than semantic creativity), to the [c]ourt's ability to … parse the activities underlying the claim and thus strip them of their sovereign character." *Rodriguez v. Republic of Costa Rica*, 139 F. Supp. 2d 173, 192–93 (D.P.R. 2001), *aff'd*, 297 F.3d 1 (1st Cir. 2002). Indeed, nearly any sovereign conduct can be broken down into non-sovereign parts. Entering a treaty—a trademark sovereign activity—involves entering a contract, which private parties can do, but it would be irrational to call entering a treaty commercial conduct on that basis. In *Nelson*, the plaintiff attempted to zero in on Saudi Arabia's narrow conduct of hiring and signing his employment agreement, which ultimately led to him being tortured. 507 U.S. at 358. But the Supreme Court rejected that approach, explaining that plaintiffs cannot parse out narrow non-sovereign conduct to avoid FSIA immunity. *Id.*; *see also Broidy Cap. Mgmt., LLC v. Qatar*, 982 F.3d 582, 594 (9th Cir. 2020) (relying on *Nelson* to reject parsing of a claim as one of "clandestine surveillance and espionage," which plaintiffs alleged as acts in which "bad actors in the commercial sphere" can engage).

The district court erred by adopting *Bailey*'s approach and allowing Plaintiffs to overcome the commercial activity exception through artful pleading.

*Second*, even if the analysis in *Bailey* were proper, it is factually distinguishable. *Bailey* was a *parens patriae* suit for economic damages brought by the former Attorney General of Missouri. Plaintiffs here are individuals seeking personal-injury damages, based on their contracting or fear of contracting COVID-19. (Doc. 19 at 3–5, 41). In other words, *Bailey* was a sovereign-to-sovereign economic suit that focused on economic harm (and which federal courts arguably have a greater interest in resolving), whereas this case involves private personal-injury plaintiffs suing the Chinese Government.

Moreover, many of Plaintiffs' allegations tying the alleged PPE hoarding to sovereign activity were absent in *Bailey*. *See* Compl., *Missouri v. People's Republic of China*, 2020 WL 1931343 (E.D. Mo. Apr. 21, 2020). For example, the complaint in *Bailey* did not include allegations of China hiding trade logs (Doc. 19 at 36) or invoking so-called Miliary-Civil Fusion to maximize China's PPE access (Doc. 19 at 38–39), or a claim that virtually all of Plaintiffs' injuries would have been avoided if the Chinese Government had shared information and taken precautions earlier (Doc. 19 at 32). The district court accordingly erred in following *Bailey*'s approach and extending it to the different allegations in this case.

### B. Plaintiffs' Suit Is Not in Connection with Commercial Activity.

With the proper gravamen identified, it is clear Plaintiffs' suit is not "in connection with a commercial activity." *Weltover*, 504 U.S. at 611. Although the FSIA does not define the term "commercial," the Supreme Court has held that an activity is "commercial" when it is an act "by which a private party engages in trade and traffic or commerce." *Id.* at 614; *accord Beg*, 353 F.3d at 1325 (cleaned up). That is, a foreign sovereign engages in commercial activity when it acts "not as regulator of a market, but in the manner of a private player within it[.]" *Weltover*, 504 U.S. at 614. "[A] government's regulation of the market, use of police power, or other activities requiring state authority are not commercial." *Beg*, 353 F.3d at 1326.

#### 1. The Chinese Government's sovereign regulatory response to COVID-19 is not in connection with commercial activity.

Directing a national response to an epidemic is undoubtedly an exercise of state authority. *Beg*, 353 F.3d at 1326 ("[A]ctivities requiring state authority are not commercial."); *Eisenberg*, 2022 WL 1591541, at *5 (collecting cases and recognizing that allegations that the PRC "engineered COVID-19, decided to conceal information concerning its escape from a

lab, and failed to prevent the spread of the virus" constitute non-commercial, political, and sovereign conduct).[10] Indeed, regulating the health and safety of one's own residents has long been recognized as a core governmental power. *See, e.g.*, *Jacobson*, 197 U.S. at 25 (defining police power to include a government's authority to regulate "the public health and the public safety"); *Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen., Fla. Dep't of Health*, 50 F.4th 1126, 1142 (11th Cir. 2022) (recognizing governmental authority to regulate the health and safety of residents, including during the COVID-19 pandemic). The United States exercised this core governmental power in its own COVID-19 response, including through presidential executive orders increasing the production of PPE, Exec. Order No. 13911, 85 Fed. Reg. 18403 (2020), and controlling officials' public communications regarding COVID-19, Exec. Order No. 13994, 86 Fed. Reg. 7189 (2021).

Here, Plaintiffs allege that the Chinese Government concealed the dangers of COVID-19 from the world by using its police powers to censor anyone who tried to spread information about the virus. (*E.g.*, Doc. 19 at

---

[10] Neither the district court in this case nor the Eighth Circuit in *Bailey* addressed whether the Chinese Government's alleged mishandling of COVID-19 was sovereign activity. Instead, they found that the Chinese Government's response to COVID-19 did not cause a direct effect in the United States, regardless of whether it was commercial activity. *Bailey*, 90 F.4th at 937; (Doc. 145 at 27–30).

21–22) (quoting an alleged statement by the Chinese Government that "[a]ny unlawful acts of fabricating, spreading rumors [related to COVID-19] and disturbing the social order will be punished by police according to the law"); (Doc. 19 at 23–24) ("In other words, if you tell the truth about a dangerous epidemic that will easily pass human-to-human and cause the death of many, you will be severely punished.").

Plaintiffs also allege the Chinese Government's refusal to notify its *own* citizens of the dangers of COVID-19 caused Plaintiffs' alleged injuries. (Doc. 19 at 30–32). Specifically, Plaintiffs allege that, even though the Chinese Government knew of the dangers of COVID-19, the Chinese Government did not "authorize[]" public officials to "do or say" anything about the virus and instead allowed New Year celebrations to proceed within China, involving hundreds of thousands of people, many of whom subsequently traveled to the United States. (Doc. 19 at 30–32).

Controlling communications with foreign nations, Chinese citizens and visitors, and public officials, as well as controlling public health decisions for events within China, are undoubtedly within the Chinese Government's police power. *See Nelson*, 507 U.S. at 362 ("Exercise of the powers of police and penal officers is not the sort of action by which private parties can engage in commerce."); *accord Beg*, 353 F.3d at 1326 ("[A] government's … use of police power … [is] not commercial."). These are not

the alleged acts of a "private player," but instead the acts of a sovereign. *Weltover*, 504 U.S. at 614. Accordingly, they cannot fall within the commercial activity exception.

**2. The alleged PPE stockpiling, even though not the gravamen of Plaintiffs' suit, is not in connection with commercial activity.**

The gravamen of Plaintiffs' suit is that the Chinese Government's sovereign response to COVID-19 caused them injuries. But even taking the alleged PPE-related conduct by itself, this Court should still find that the alleged conduct is sovereign activity, and not "in connection with a commercial activity." 28 U.S.C. § 1605(a)(2).

*First*, the Amended Complaint does not allege that the Chinese Government acted as a private player, collecting PPE to sell for profit. Rather, it alleges that China used *distinctly* sovereign powers to block exports, conceal trade logs, subsidize manufacturing, and force its citizens to supposedly hoard PPE. (Doc. 19 at 36–40). This is not a case where "[a]ny party, sovereign or not," could perform the alleged conduct. *Honduras Aircraft*, 129 F.3d at 548 (finding conduct commercial because, unlike here, Honduras joined the market as a "private player" to enter the same kinds of contracts that private parties enter into, not to regulate the market or perform sovereign activities). Instead, "the regulation of imports and exports is a sovereign prerogative." *Chisholm & Co. v. Bank of Jamaica*, 643 F. Supp.

1393, 1401 (S.D. Fla. 1986); *see MOL, Inc. v. Peoples Republic of Bangladesh*, 736 F.2d 1326, 1328–29 (9th Cir. 1984) (commercial activity exception did not apply to the breach of a government contract for the sale of monkeys because it involved a sovereign regulating its own export of its natural resources).

*Second*, although Plaintiffs derisively label it "hoarding," maintaining a supply of necessary equipment in response to a public health emergency is itself sovereign conduct. In fact, the United States government itself engages in the maintenance of a "Strategic National Stockpile" of such medical supplies to prepare for a possible public health or other global emergencies. *See* 42 U.S.C. § 247d-6b. And notably, that stockpile specifically includes "personal protective equipment." 42 U.S.C. § 247d-6b(a)(1). That is a telltale sign that maintaining such a supply is a sovereign activity, not a commercial activity. Under Plaintiffs' theory of the case, if the United States accumulated too much PPE (or too little PPE) in its own stockpile, the United States could be haled into court in China or elsewhere for any alleged downstream results of that sovereign conduct. The whole point of the FSIA, however, is to prevent the indignity and tension that arises when the courts of one sovereign second-guess the sovereign activities of another.

Plaintiffs argue that suppressing information about COVID-19 while hoarding PPE is "no different than a private corporation trying to suppress bad information that might affect its stock." (Doc. 136 at 4–5). But the People's Republic of China does not have anything akin to a "stock price." And again, the "nature" of the alleged action—here, the exercise of police powers—is key. *Nelson*, 507 U.S. at 356 (quoting 28 U.S.C. § 1603(d)). Plaintiffs specifically allege that the Chinese Government was able to suppress information about COVID-19 through coercion and the threat of jail. (*E.g.*, Doc. 19 at 21–24). Plaintiffs even allege that the Chinese Government was able to force Chinese companies abroad to collect PPE by enforcing the "Military-Civil Fusion," which Plaintiffs describe as "one of the PRC's most supreme laws." (Doc. 19 at 38).

The use of the threat of jail to suppress information and the enforcement of a "supreme[] law" are undoubtedly exercises of police power. *Nelson*, 507 U.S. at 362 (The "[e]xercise of the powers of police … is not the sort of action by which private parties can engage in commerce"). The allegation that the Chinese Government exercised its police powers to suppress information for an alleged commercial gain does not change the sovereign nature of their actions. The purpose of the conduct does not matter: Even when sovereign conduct is used for commercial purposes, that is "irrelevant to the question of an activity's commercial character." *Id.* at 362–

63 (sovereign conduct used "to resolve commercial disputes" was not commercial activity).

*Third*, even if any part of the alleged PPE stockpiling could theoretically be done by a private player, the broader context of such conduct confirms it was in connection with the Chinese Government's regulatory response to COVID-19, which is sovereign activity. As the D.C. Circuit persuasively explained, "[a]lthough the purpose and perhaps the illegal character of the alleged acts are irrelevant in judging their commercial character … the context in which the acts take place must be germane." *Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 168–69 (D.C. Cir. 1994), *superseded by statute on other grounds*, National Defense Authorization Act, Pub. L. No. 110-181, 122 Stat. 3 (2208). As explained below, the alleged stockpiling here was done in the context of the purely sovereign power to manage a national response to a pandemic, reinforcing the fact that it was not commercial conduct.

This Court, on numerous occasions, has considered the context in which an act occurred when deciding if it was commercial. For example, in *Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel*, 657 F.3d 1159, 1177–78 (11th Cir. 2011), the Eleventh Circuit concluded that a Spanish vessel was immune from arrest because, although it "did transport private cargo of Spanish citizens for a charge," which looks like

commercial activity, the ship also provided "protection and safe passage to property of Spanish citizens," which was a miliary function of the Spanish Navy and therefore "of a sovereign nature." *Id.* at 1177. The overall context revealed that the seemingly commercial act was part of a larger sovereign activity for the purpose of providing safe passage for Spanish citizens.

Similarly, in *Devengoechea*, this Court held that Venezuela's decision not to pay an art collector was commercial activity—rather than sovereign expropriation—after considering the greater context for the claims, which arose as part of "Venezuela's negotiations in the private market for the Bolívar Collection." 889 F.3d at 1224, 1229.

Here, the context in which the alleged PPE stockpiling arose was the Chinese Government's response to COVID-19. Plaintiffs concede that it is only "against this backdrop" that the alleged PPE-related conduct occurred. (Doc. 116 at 9). Like the ship in *Odyssey Marine*, which performed a commercial function *alongside* a sovereign function, the alleged PPE stockpiling here cannot be divorced from the sovereign conduct underlying the entire suit.

The district court rejected this context-based approach because it "found nothing in any Eleventh Circuit case to suggest that we have the discretion, at this stage of the case, to engage in a 'contextual' inquiry to

determine whether a foreign defendant's acts are truly 'in connection with' a commercial activity." (Doc. 145 at 20). The cases cited above establish otherwise. The district court also stated that cases like *Odyssey Marine* and those involving governmental taking of property are inapposite because "[t]he confiscation of private land and the use of a naval frigate to patrol the seas of the Spanish Empire are obviously sovereign acts, whereas the attempted monopolization of the PPE market … is plainly a 'commercial activity.'" (Doc. 145 at 19).

But that misses the point. *Odyssey Marine* and the cases above stand for the proposition that when a foreign sovereigns' actions involve commercial and sovereign elements, the *context* of the actions controls. In *Odyssey Marine*, this Court did not split up the goods in the shipwrecked vessel and allow the plaintiff to recover items within the shipwreck that were commercial but not those that were sovereign. It found that even if the ship was used partially for commercial activity, its primary service was sovereign, and therefore the entire ship was off limits. Likewise, here, the Court should not separate the PPE-related allegations (even if any part of them was commercial) from the overall sovereign nature of the Chinese Government's response to COVID-19.

That is especially true for Sherman Act claims, which are the claims at issue in this appeal. The Supreme Court has long recognized the Sherman Act was never intended to restrain government conduct merely because it involves commercial conduct. *See Parker v. Brown*, 317 U.S. 341, 350–51 (1943). Indeed, antitrust claims can only be brought to remedy injuries that antitrust law was "intended to prevent." *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1449 (11th Cir. 1991). These fundamental principles underlying antitrust law echo the same rules guiding FSIA-immunity analyses: Plaintiffs cannot disguise sovereign conduct as commercial activity to bring claims that do not belong in court.

*Finally*, there is no basis for following *Bailey* and finding commercial activity is at issue. As to the PPE-related allegations, the Eighth Circuit held, remarkably, that "[t]aking over mask-producing factories and buying up a substantial portion of the world's supply of personal-protective equipment are the actions of 'a private player' in the market." *Bailey*, 90 F.4th at 938. This holding contradicts Eleventh Circuit law for two reasons. First, taking over factories is plainly sovereign activity, as this Court has noted. *See Beg*, 353 F.3d at 1326 ("Confiscation of real property is a public act because private actors are not allowed to engage in 'takings' in the manner that governments are."). The district court even acknowledged that "[t]he confiscation of private land … [is] obviously [a] sovereign act,"

but then ignored the parallel to the alleged conduct here. (Doc. 145 at 19). Second, the Eighth Circuit's holding ignores the context in which the alleged PPE stockpiling occurred: The Chinese Government's response to COVID-19 (*i.e.*, sovereign activity). *See Odyssey Marine*, 657 F.3d at 1177–78; *Devengoechea*, 889 F.3d at 1224.

Beyond that, *Bailey's* reasoning is unpersuasive. It addressed the commercial nature of the alleged PPE stockpiling in one paragraph, describing it as simply "[b]uying and selling personal-protective equipment." 90 F.4th at 938. It completely overlooked that the Chinese Government exercised its sovereign police powers to allegedly stockpile PPE. That is, *Bailey* failed to address the key conduct the Chinese Government is alleged to have engaged in here to stockpile PPE, including blocking exports, concealing trade logs, subsidizing manufacturing, and forcing Chinese citizens to supposedly hoard PPE. (Doc. 19 at 36–40). If *Bailey* had considered such conduct, it could not have found that the PPE-hoarding claims centered on commercial activity.

Therefore, even the alleged PPE-related conduct was not in connection with commercial activity because it involved conduct only a sovereign could undertake and arose in the context of the Chinese Government's response to a pandemic.

### C. There Was No Direct Effect in the United States.

Regardless of whether Plaintiffs can establish that the core conduct underlying the suit was commercial, the Chinese Government's alleged actions did not "cause[] a direct effect in the United States." 28 U.S.C. § 1605(a)(2). Both the district court and the Eighth Circuit in *Bailey* held that the Chinese Government's alleged mishandling of COVID-19 did not cause a direct effect in the United States. (Doc. 145 at 29–30); *Bailey*, 90 F.4th at 937–38. So if this Court focuses on the proper gravamen—the alleged mishandling of COVID-19—then both courts would have agreed sovereign immunity applies. But even the so-called PPE hoarding itself could not have caused a direct effect in the United States because there were so many intervening events between the Chinese Government's alleged actions and any alleged PPE shortage in the United States.

"An effect is direct if it follows as an immediate consequence of the defendant's … activity." *Weltover*, 504 U.S. at 618 (internal quotation marks omitted). Unlike ordinary proximate cause analyses, the question here is not whether an effect was "foreseeable" or even "substantial." *Id.* at 617–18. Even if an effect was foreseeable, it still must be an *immediate consequence* of the relevant alleged conduct to satisfy the directness standard. *Id.* The point is to determine whether the alleged effect was "sufficiently 'in the United States' that Congress would have wanted an American court to hear the case[.]" *Guevara v. Republic of Peru*, 608 F.3d 1297,

1309 (11th Cir. 2010) (citation omitted). "'[T]he requisite immediacy' is lacking where the alleged effect 'depend[s] crucially on variables independent of' the conduct of the foreign state." *Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 75 (2d Cir. 2010) (citation omitted). "The common sense interpretation of a 'direct effect' is one which has no intervening element[.]" *Upton v. Empire of Iran,* 459 F. Supp. 264, 266 (D.D.C. 1978), *aff'd*, 607 F.2d 494 (D.C. Cir. 1979) (unpublished table decision).

The direct-effect requirement "indicates that Congress did not intend to provide jurisdiction whenever the ripples caused by an overseas transaction manage eventually to reach the shores of the United States." *United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*, 33 F.3d 1232, 1238 (10th Cir. 1994). Rather, courts "look to the place where the legally significant acts giving rise to the claim occurred in determining the place where a direct effect may be said to be located." *Araya-Solorzano v. Gov't of the Republic of Nicaragua*, 562 F. App'x 901, 904 (11th Cir. 2014) (citations omitted).

The Supreme Court recently affirmed that the commercial-activity exception "call[s] for considerable domestic nexus." *CC/Devas (Mauritius) Ltd. v. Antrix Corp.*, 145 S. Ct. 1572, 1580 (2025). In doing so, it contrasted the direct effect requirement applicable here with other FSIA exceptions that may require "less direct or pervasive contact with the territory of the

United States." *Id.* In other words, the Supreme Court recognized that the commercial activity exception imposes a relatively high bar for establishing directness.

#### 1. The alleged actions by the Chinese Government, in China, did not have a direct effect in the United States.

Plaintiffs' allegations relating to the Chinese Government's response to COVID-19 boil down to the following: The Chinese Government supposedly failed to warn the world of the dangers of COVID-19, used coercion to censor doctors and public officials who tried to speak out against COVID-19, directed public health decisions and allowed large gatherings, and, ironically, shut down Wuhan (which Plaintiffs allege caused a mass exodus). (Doc. 19 at 30–32). All of these actions occurred abroad and could not have *directly* caused COVID-19 cases to reach the United States, let alone spread *within* the United States. There were numerous intervening events that led to COVID-19 reaching the United States, spreading from person to person within the United States, and causing harm.

As both the district court and the Eighth Circuit explained, in order for the Chinese Government's alleged actions to have any direct effect in the United States, COVID-19 would first need to reach the United States. (Doc. 145 at 27–29); *Bailey*, 90 F.4th at 937. There are no allegations that the Chinese Government purposely sent knowingly infected individuals to

the United States. (Doc. 145 at 29 n.9). Instead, infected individuals had to voluntarily decide to travel to the United States. *Bailey*, 90 F.4th at 937. That is, the theory of domestic harm depends on the intervening action of independent third parties. That is at least one intervening step between the Chinese Government's actions and COVID-19 reaching the United States.

But even once infected individuals arrived in the United States, COVID-19 had to spread within the United States to cause any harm. That involves intervening steps by third parties, including infected individuals failing to quarantine and then interacting with other individuals, causing the disease to spread; states failing to implement effective stay-at-home, closure, or similar orders and advice; individuals violating those orders and advice; businesses and schools failing to shut down prior to the issuance of any orders and advice; international borders remaining open; individuals failing to use available PPE; or PPE shortages caused by whole potential hosts of reasons separate and apart from the alleged conduct of the Chinese Government. Those factors, alone or in tandem, could have led to COVID-19 spreading in the United States. (Doc. 145 at 28) ("For example, many businesses, schools, and local governments, in the United States continued to operate in 2020 until stay-at-home orders were is-

sued.") (citation omitted). Simply put, "the spread of COVID-19 throughout the United States wasn't 'an immediate consequence' of the Defendants' activities." (Doc. 145 at 28).

As the district court and the Eighth Circuit in *Bailey* correctly noted, "the Defendants' alleged malfeasance vis-à-vis the COVID-19 virus cannot be reasonably described as having a 'direct effect' in the United States given the innumerable variables—many of them having nothing to do with China—that also contributed to that spread." (Doc. 145 at 29); *accord Bailey*, 90 F.4th at 937–38 (noting that "the alleged 'malfeasance and deception' behind the spread of COVID-19," even if commercial activity, had "effects [that] were 'remote and attenuated[.]'") (citation omitted).

### 2. The PPE-related allegations did not cause a direct effect in the United States.

When assessing whether conduct caused a direct effect in the United States, courts look at the acts that actually injured the plaintiff. *Guirlando*, 602 F.3d at 80 (finding that a Turkish bank allowing a wife and husband to open a joint bank account did not cause a direct effect in the United States because the real injury was the husband's withdrawal of the money from the bank account without the wife's consent, not the opening of the bank account itself). Again, here, Plaintiffs were allegedly injured by the spread of COVID-19, which they trace back to the Chinese Government's mishandling of COVID-19 that did not have a direct effect in the

United States. Not even the alleged PPE stockpiling could have caused a direct effect in the United States, for three reasons.

*First*, PPE collection in China could only *possibly* have had an effect in the United States if COVID-19—an intervening factor—spread within the United States. Even the Eighth Circuit in *Bailey* acknowledged that alleged PPE acquisition did not have an effect in the United States until "the virus spread and people all over the world became sick." 90 F.4th at 939. It nonetheless found that the alleged PPE acquisition caused a direct effect. In doing so, it departed from this Court's precedent that in determining whether an act based upon commercial activity had a direct effect in the United States, "the question is" whether its effect was "sufficiently direct and sufficiently in the United States that Congress would have wanted an American court to hear the case." *Guevara*, 608 F.3d at 1309.

Indeed, relying on this Court's precedent, Chief Judge Smith dissented from the two-judge majority in *Bailey*, stating that any effect caused by the so-called PPE hoarding was neither sufficiently direct nor sufficiently in the United States—due to the long chain of intervening causes, including the spread of COVID-19 itself—such that "Congress would have wanted an American court to hear the case." *Bailey*, 90 F.4th at 941 (Smith, C.J., concurring in part and dissenting in part) (quoting *Guevara*, 608 F.3d at 1309) (internal quotation marks omitted).

The district court, in a "close call," adopted the reasoning of the *Bailey* majority despite acknowledging the "tension between *Bailey* and *Guevera*[.]" (Doc. 145 at 17, 21) (citation omitted). That was error, for the reasons above. Beyond that, *Bailey* was brought by a sovereign state alleging that the Chinese Government's conduct directly caused a public health emergency that the state was required to respond to. 2020 WL 1931343, at ¶¶ 1–9. The chain between the Chinese Government's conduct and the need for a state to respond to its own public health crisis is far shorter than the chain alleged in this case, between the Chinese Government's alleged conduct in China and alleged injury to *individual medical workers* in scattered states across the country. (Doc. 19 at 38–39). Indeed, PCIA (the only United States-based entity allegedly involved) is located in Texas, and is not even in the same state as any of the named-Plaintiff workers, further confirming that there are multiple additional links in the alleged causal chain here. In other words, *Bailey* is unpersuasive on directness in part because its theory of harm was less speculative and less remote than the claims here that require connecting the Chinese Government's conduct to individual plaintiffs.

As such, COVID-19 spreading throughout the United States was clearly an intervening event (actually, a vast number of independent intervening events) that led to the alleged PPE collection having any effect in the United States, and *Bailey* got it wrong.

*Second*, PPE collection in China could only have caused effects in the United States if the *demand* for PPE increased. And by Plaintiffs' allegations, demand for PPE increased only because of COVID-19 and the alleged mishandling of COVID-19 by the Chinese Government. (Doc. 19 at 40) ("This effective control and monopoly of the market means they can now charge artificially higher prices for the PPE that is so desperately needed, ***because of a pandemic they [allegedly] created***.") (emphasis added). Again, the spread of COVID-19 is an intervening event.

*Third*, the allegations of PPE collection within the United States are *de minimis*. Plaintiffs argue that the Chinese Government "enlisted" employees abroad to buy up PPE and ship it back to China. (*E.g.*, Doc. 19 at 37). The only specific example of this "enlistment" in the United States is Plaintiffs' allegation that the Chinese Government sent PCIA employees to "pharmacies and stores such as Home Depot and Lowe's to find masks, particularly N-95s." (Doc. 19 at 38–39). It cannot be the case that one company going to Home Depot and Lowe's stores in Houston, Texas, to buy

one specific type of mask—not even all types of masks or all PPE generally—had a direct effect on the availability of PPE in the United States. *See Weltover*, 504 U.S. at 618 ("[J]urisdiction may not be predicated on purely trivial effects in the United States.").

In sum, Plaintiffs cannot hale the Chinese Government into United States courts, under American-law causes of action, based on its sovereign conduct in handling an epidemic, let alone when such conduct has no direct effect in the United States. The Chinese Government is immune in this case, which means the claims against PCIA are likely to be dismissed on remand.

## CONCLUSION

This Court should reverse the district court's order permitting Counts VI–IX to proceed against the Chinese Government and remand for further proceedings.[11]

[11] The FSIA Order did not concern personal jurisdiction because the district court ordered briefing "*only* on the question of subject matter jurisdiction under the [FSIA]." (Doc. 112 at 1) (emphasis in original). PCIA preserved its arguments as to personal judgment in the district court proceedings (Doc. 122 at 6), and does not intend to waive those arguments in this appeal.

Respectfully submitted,

*/s/ Pravin Patel*
Pravin Patel
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
(305) 577-3180
pravin.patel@weil.com

*Counsel for PetroChina International (America), Inc.*

November 10, 2025

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record certifies pursuant to Fed. R. App. P. 32(g) that the Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f), this document contains 12,385 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Century Schoolbook font in 14 point size.

*/s/ Pravin R. Patel*

Pravin Patel
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
(305) 577-3180
pravin.patel@weil.com

November 10, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2025, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of such filing to all ECF participants.

*/s/ Pravin R. Patel*

Pravin Patel
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
(305) 577-3180
pravin.patel@weil.com

November 10, 2025