**DOCKET NO.: 25-12241**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

_____

**MORIAH AHARON, ET AL.,**

Plaintiffs - Appellees,

v.

**CHINESE COMMUNIST PARTY, ET AL.,**

Defendants,

**PETROCHINA INTERNATIONAL (AMERICA), INC.,**

Defendant - Appellee.

_____

On Appeal from the United States District Court
for the Southern District of Florida
Case No.: 20-cv-80604-RKA

_____

**APPELLEES' ANSWER BRIEF**

_____

**MATTHEW T. MOORE**
**BERMAN LAW GROUP**
5801 Congress Avenue
Boca Raton, FL  33487
PH: (561) 826-5200

*Counsel for Appellees*

25-12241
*Aharon, et al. v. PetroChina International (America), Inc.*

**CERTIFICATE OF INTERESTED PERSONS**
**AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to 11th Cir. R. 26.1-1(a)(2), counsel for Appellees certify that the following is a complete list of the trial judges, all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the appeal.   Appellees further certify that there   are no publicly traded corporations known to have any interest in this matter.

1.  Aharon, Moriah — Plaintiff in district court proceedings;

2.  Kuppinger, Jordan G — Plaintiff in district court proceedings;

3.  Deteso, Damon J. — Plaintiff in district court proceedings;

4.  Caruso, Rosanna- Plaintiff in district court proceedings;

5.  Payton, Christopher — Plaintiff in district court proceedings;

6.  Angioletti, Lee- Plaintiff in district court proceedings;

7.  Manning, Mariangella — Plaintiff in district court proceedings;

8.  Vasquez, Lynnora — Plaintiff in district court proceedings;

9.  Madden, Rebecca — Plaintiff in district court proceedings;

10. The People's Republic of China — Defendant in district court proceedings;

11. The Chinese Communist Party — Defendant in district court proceedings;

C1 of 2

12. Altman, Roy K. — United States District Judge, United States District Court, Southern District of Florida;

13. Reinhart, Bruce R.-Magistrate Judge, United States District Court, Southern District of Florida;

14. Moore, Matthew T.- Counsel for Plaintiffs;[1]

15. The Law Offices of Berman & Berman, P.A. d/b/a Berman Law Group — Counsel for Plaintiffs/Appellees;

16. Patel, Pravin R.- Counsel for Defendant-Appellant PetroChina International (America), Inc.;

17. Guernsey Jr., Daniel P. — Counsel for Defendant—Appellant PetroChina International (America), Inc.;[2]

18. Katzen, Alli G. — Counsel for Defendant—Appellant PetroChina International (America), Inc.;

19. Masterson, Marina — Counsel for Defendant—Appellant PetroChina International (America), Inc.;

20. Weil, Gotshal & Manges LLP- Counsel for Defendant/Appellant PetroChina International (America), Inc.;

21. PetroChina International Co., Ltd. — Appellant's parent corporation;

22. PetroChina International (Canada) Trading, Ltd. — Appellant's subsidiary corporation; and

23. PetroChina International (Brazil) Trading, Ltda.- Appellant's subsidiary corporation.

---

[1] Counsel for Appellant listed a former co-counsel for Plaintiffs/Appellees, Vincent J. Duffy on their Certificate of Interested Persons. Mr. Duffy left Plaintiffs' law firm and no longer has any interest in this case.

[2] This Court granted the Motion to Withdraw for Attorney Dnaiel P. Guernsey Jr. on January 5, 2026.

C2 of 2

## **<u>STATEMENT REGARDING ORAL ARGUMENT</u>**

Oral argument would assist the Court. This appeal presents complex issues of sovereign immunity and its exceptions under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 et seq. ("FSIA").  Whether the Chinese sovereign defendants may be held to answer  in a U.S. court for their alleged wrongdoing related to the hoarding of Personal Protective Equipment under a commercial activities exception of the FSIA is a novel question in this Circuit. This question, as well as whether Appellant has standing to make the arguments here, would benefit from oral argument in aiding the Court to further understand the issues presented on appeal.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT ............................................C1

STATEMENT REGARDING ORAL ARGUMENT ...........................................i

TABLE OF CITATIONS ..............................................................................iv

STATEMENT OF JURISDICTION.................................................................1

INTRODUCTION ........................................................................................2

STATEMENT OF THE ISSUES.....................................................................6

STATEMENT OF THE CASE.........................................................................6

    A.    Response to Statement of Facts ......................................................6
    B.    Response to Procedural History .....................................................8
    C.    Standard of Review ......................................................................11

SUMMARY OF THE ARGUMENT ................................................................12

ARGUMENT .............................................................................................13

I.    PCIA DOES NOT HAVE STANDING TO SPEAK FOR THE CHINESE
GOVERNMENT AS TO CHINA'S SOVEREIGN IMMUNITY................13

    A.    It Is Clear Who PCIA Is Arguing For ...........................................13
    B.    Appellees Did Not Agree to Dismiss PCIA If China Is Found to Be
        Fully Immune...............................................................................13
    C.    PCIA's Contention that it Is Aggrieved Is a Chimera....................16

II.    THE COMMERCIAL ACTIVITY EXCEPTION APPLIES TO THE
CHINESE GOVERNMENT TO ABROGATE SOVEREIGN IMMUNITY
RELATED TO PPE HOARDING AND MARKET MANIPULATION.....18

    A.    PCIA's "Gravamen" Arguments Do Not Apply Here ...................18
    B.    Cornering the Market in PPE Is Not a Sovereign Act....................23

C.      The Commercial Activity Exception Applies
        to Defendants' Acts  .........................................................................24

        1.      This lawsuit is based upon acts that took place outside the
                United States ........................................................................25
        2.      The acts were taken in connection with a
                commercial activity...............................................................27
        3.      The acts caused a direct effect in the United States..................30

D.      *Odyssey Marine* Is Inapposite.........................................................32

CONCLUSION............................................................................................33

CERTIFICATE OF COMPLIANCE.............................................................34

CERTIFICATE OF SERVICE .....................................................................34

## **TABLE OF CITATIONS**

**Cases**

*Africa Growth Corp. v. Republic of Angola*, No. 21-11136, 2023,
U.S. App. LEXIS 12594 (11th Cir. May 23, 2023) ....................................22

*Agudas Chasidei Chabad v. Russian Federation,*
110 F.4th 242, 248 (D.C. Cir. 2024) ........................................................14

*Agudas Chasidei Chabad v. Russian Federation*, No. 24-909,
2026 U.S. LEXIS 442 (U.S., Jan. 20, 2026)...................................................14

*Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323 (11th Cir. 2003)...............27,28

*De Csepel v. Republic of Hungary*, 714 F.3d 591(D.C. Cir. 2013)...............25,31,32

*Devengoechea v. Bolivarian Republic of Venezuela*,
889 F.3d 1213(11th Cir. 2018).............................................................25,27,29

*Guevara v. Republic of Peru*, 608 F.3d 1297 (11th Cir. 2010) ..........................29,30

*Harris Corp. v. Nat'l Iranian Radio & Television*,
691 F.2d 1344 (11th Cir. 1982).....................................................................30

*Hendricks v. Bank of America, N.A.*, 40 8 F.3d 1127(9th Cir. 2005).................15,16

*Honduras Aircraft Registry, Ltd. v. Gov't of Honduras*,
129 F.3d 543 (11th Cir. 1997).......................................................................29

*Mantin v. Broad. Music, Inc.*, 248 F.2d 530 (9th Cir. 1957)...................................13

*Minpeco, S.A. v. Hunt*, 718 F. Supp. 168 (S.D.N.Y. 1989)...............................23,24

*Missouri. ex rel. Bailey v. People's Republic of China*,
90 F.4th 930 (8th Cir, 2024)........................................................*passim*

*Missouri v. People's Republic of China, et al.*,
Case No. 20-cv-000999 (E.D. Mo.) ........................................................n.4

*N.J. Dep't of Env'mtl. Prot. v. Am. Thermoplastics Corp.*,
    974 F.3d 486 (3d Cir. 2020) ...............................................................15

*Nix v. NASA Fed. Credit Union*, 200 F. Supp. 3d 578 (D. Md. 2016) ...................13

*OBB Personenverkehr AG v. Sachs*, 577 U.S. 27 (2015)................................*passim*

*Odyssey Marine Expl., Inc. v. Unidentified Shipwrecked Vessel*,
    657 F.3d 1159 (11th Cir. 2011) ..................................................................32

*Repub. of Argentina v. Weltover*, 504 U.S. 607 (1992)...................................*passim*

*Reyes, et al., v. People's Republic of China, et al.*,
    Case No. 20-cv-21108-Cannon (S.D. Fla.) ....................................................n.6

*S. Mills, Inc. v. Nunes,* 586 F. App'x 702 (11th Cir. 2014)....................................17

*Samco Global Arms, Inc. v. Arita*, 395 F.3d 1212 (11th Cir. 2005)........................31

*Saudi Arabia v. Nelson,* 507 U.S. 349 (1993) ....................................................*passim*

*Shultz v. Nomac Drilling, L.L.C.*, No. 17-cv-169-R,
    2017 U.S. Dist. LEXIS 106564, (W.D. Okla. July 11, 2017) ......................13

*United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131 (D.D.C. 1982).................24

*United States v. Carmack*, 329 U.S. 230 (1946)...............................................27,28

*Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*, 946 F.3d 120 (2d Cir. 2019).......14

*Warth v. Seldin*, 422 U.S. 490 (1975).................................................................17

*Wolff v. Cash 4 Titles*, 351 F.3d 1348 (11th Cir. 2003).........................................15

## **Statutes**

28 U.S.C. § 1291 ...............................................................................................1

28 U.S.C. § 1605(a)(2)...................................................................................24,25

28 U.S.C. § 1608(a) ......................................................................................8

## **Other**

Black's Law Dictionary (6th ed. 1990) ...........................................*passim*

## <u>STATEMENT OF JURISDICTION</u>

This is an appeal from an Order denying a motion to dismiss on grounds of sovereign immunity, which may be treated as a "final" order that is appealable under the collateral order doctrine. It is based on the Report & Recommendation of the magistrate below, which was then adopted by the district court, which subsequently entered the Order appealed from here. This Court has jurisdiction pursuant to Title 28 U.S.C. § 1291.

**INTRODUCTION**

The topic of China's sovereign immunity as to the spread of the COVID-19 pandemic ("the pandemic"), and the *separate* topic of China's hoarding and cornering the market for Personal Protective Equipment ("PPE") have already been addressed by the Eighth Circuit Court of Appeals in *Missouri. ex rel. Bailey v. People's Republic of China*, 90 F.4th 930 (8th Cir, 2024). Based on two Complaints largely borrowed from Appellees here, the Attorney General of Missouri filed one combined complaint against the Chinese Government.[3] China refused to appear in the Missouri district court, as they did here, and after the Missouri district court declined to find subject matter jurisdiction,[4] on appeal, the Eighth Circuit provided the same outcome as below: finding immunity for claims related to the spread of the pandemic, *but not* for the claims related to PPE. *Id.* The district court correctly applied the reasoning of the Eighth Circuit to the same basic set of facts and circumstances in reaching the same result on the PPE claims here.

PetroChina International (America), Inc. ("PCIA") makes this appeal in the voice of the Chinese Government, while expressly maintaining it is not an agent or instrumentality of China. PCIA expressly objected to the Report & Recommendation

---

[3] Appellees sued both the People's Republic of China and the Chinese Communist Party, and they will be referred to collectively herein as "the Chinese Government," or "China."

[4] *Missouri v. People's Republic of China, et al.*, Case No. 20-cv-000999 (E.D. Mo.), *see generally* Docket, DE 61.

2

finding that it was an agent or instrumentality of China, and the district court sustained that objection. (DE 135).[5] Appellees have always questioned the curious nature of PCIA arguing on behalf of China, and its standing to do so. Despite being on notice of the Amended Complaint in September 2020 (DE 23); despite sending a letter refusing service under the Hague Convention in March 2021 (DE 42); and despite being served by the U.S. Embassy in Beijing in January 2023 (and formally refusing to respond in writing), (DE 85), China has chosen not to appear and defend itself or fight subject matter jurisdiction. China could have appeared solely to fight subject matter jurisdiction and has had almost six years to do so.

Despite the district court finding it has no standing to do so, PCIA is again making a collateral attack on China's behalf and trying to litigate what should have been China's motion to dismiss. (DE 145, n.3). Here, PCIA tries to mask its position with a tenuous argument that the outcome directly affects them, that it is an aggrieved party; but it does not, it is not. To be clear, Appellees' Amended Complaint contains direct allegations against PCIA and direct claims, separate from those against the Chinese Government, related to its own hoarding activity. PCIA, based in Houston, has been registered to do business in Florida since 2007. (DE 19, ¶ 20).

---

[5] Citations to "DE" are the Docket Entry numbers in the district court, with page numbers referencing the number in the header generated by the CM/ECF system. Citations to Appellant's Brief shall be as "Br."

3

PCIA further continues to mischaracterize speculative statements made by counsel for Appellee — in response to speculative questions by the district court three years ago, when this case was in a different posture, and well prior to the Eighth Circuit's opinion in *Bailey.* Those statements about whether the lawsuit would continue without the Chinese Government were not conclusive or final at all, which the text of the court transcript clearly demonstrates. Appellees did not definitively state that the lawsuit would be dismissed against PCIA if claims against China were dismissed. PCIA does not have standing to make arguments on behalf of the Chinese Government about China's sovereign immunity when the Chinese Government refused to defend itself.  PCIA is a named party, not an aggrieved party, and as the district court said, it will have its opportunity to make its arguments on personal jurisdiction and the merits of the claims.

But even if it did have standing, PCIA erroneously continues to argue that the gravamen of the Amended Complaint is causation of the pandemic itself (and not PPE). But PPE hoarding has always been a distinct set of claims in the district court, where the pandemic plays a supporting role in the genesis of those claims.  It would be impossible to speak of the PPE hoarding without speaking about the pandemic.[6]

---

[6] Indeed, Appellees' law firm concurrently filed and maintains a separate lawsuit against the Chinese Government for only the general pandemic claims:  *Reyes, et al., v. People's Republic of China, et al.*, Case No. 20-cv-21108-Cannon (S.D. Fla.), which remains pending and waiting for service on China by the U.S. State Department.

But the district court found, as the Eighth Circuit found under substantially similar facts, that Appellees plausibly alleged that PPE hoarding came first, and that China "leveraged the ignorance" of the world as to COVID-19 prior to its historic spread, to carry out its commercial  scheme to corner the market for PPE.

Appellant re-argues that concealing and failing to contain the pandemic is discretionary sovereign activity, and since there would be no PPE hoarding without the sovereign activity, the hoarding conduct cannot stand alone.  We know that is not true.  There was a pandemic and China failed to stop it when it could have done so.  And prior to that alleged failure to stop it, there were also the separate and distinct acts of hoarding and market manipulation as to PPE by the market leader. Those are the gravamen of Appellees' claims, as the Amended Complaint makes clear.  The *Bailey* court and the district court correctly saw the distinction.

The opinion and Order on PPE claims below should be affirmed, and this matter remanded for further proceedings below.

**STATEMENT OF THE ISSUES**

(1)    Does Appellant have standing to make its arguments here, when it has argued and maintains it is not an agent or instrumentality of the Chinese Government, and the district court agreed, and further determined it did not have standing to argue on behalf of China?

(2)    If Appellant does have standing to maintain this appeal, was the district court correct to find that the commercial activities exception to sovereign immunity pursuant to the FSIA applied, such that the China's governmental entities may be made to answer for their alleged misconduct in hoarding Personal Protective Equipment ahead of the spread of the COVID-19 pandemic?

**STATEMENT OF THE CASE**

**A. Response to Statement of Facts**

Appellees generally agree with the facts presented by Appellant.  This matter has not made it past the Amended Complaint and jurisdictional briefing, and thus the procedural record and the contents of the Amended Complaint are plainly evident. Where Appellees and Appellants diverge is when Appellant starts making arguments and characterizations in its Statement of Facts that are untrue.

First, the initial Complaint in this matter was filed on April 8, 2020, less than a month after the national emergency was declared on March 13, 2020, and when knowledge of the pandemic was still in its infancy.  (DE 1).  Appellees filed their

6

Amended Complaint on July 7, 2020 (DE 19), and the matter was administratively closed by the district court on July 6, 2020, (DE 18), while service was attempted. Three years later service was completed and the district court determined Appellees could file a Clerk's default on China's governmental entities, but that briefing on subject matter jurisdiction was needed. (DE 111). Thus, the opportunity for discovery and any further amendments to the Complaint has been abated for almost six years, while the world has learned more and more about the history of the pandemic. Appellees' nascent 2020 pandemic allegations included nine Counts of wrongdoing in its Amended Complaint, four of which were distinct to the commercial nature of the PPE hoarding and market manipulation. (DE 19, pp. 50–55). The allegations related to the spread of the pandemic itself supported Counts I-V, while creating the context for the genesis of Counts VI-IX, as stated in the Amended Complaint.

With one exception, the nine named Plaintiffs each make a specific allegation about the lack of PPE available to them as medical providers due to the shortages, and that it caused them harm. (DE 19, ¶¶ 7–15). Plaintiffs chiefly complain about the harms caused by the shortage and while they may not make specific price allegations (and a market analysis was not required to make their allegations), they include many allegations of how the scheme purportedly worked. (*See generally*, DE 19, ¶¶ 139-156).

Moreover, this case is not before the Court on whether or not a class can be certified, nor have such issues been briefed. (Br. at 9). Despite the length of time this case has been pending, the Amended Complaint has been administratively stayed while the jurisdictional issues play out.

## B. Response to Procedural History

Again, Appellees largely do not contest the recitation of the nuts and bolts of the procedural journey to this point — it's plainly in the Record. But there are certain mischaracterizations. First, Appellees did not take "three years to serve the Chinese Government pursuant to 28 U.S.C. § 1608(a)." As required by the FSIA, Appellees first attempted service via the Hague Convention and through China's Ministry of Justice. The Ministry of Justice took approximately six months to respond that it would not effectuate service on sovereign immunity grounds. (DE 42). The FSIA required a certain hierarchy of actions if service under the Hague Convention was rebuffed, ultimately requiring Appellees to get permission from the district court to continue service via diplomatic channels by the U.S. State Department ("State"). (DE 50). The district court referred the request to the magistrate on November 23, 2021, (DE 60), and Appellees were finally allowed to proceed with service via State on December 21, 2021. (DE 64).

However, service through State required new translations into Official Chinese of the service documentation and other steps (*see* DE 71), as well as re-

8

issued summonses.  (DEs 67, 68, 70). That process was complete and the service packets were received by State in February 2022.  (*See* DE 71).

Throughout the entire service journey, Appellees were filing monthly status reports with the district court.  (*See*, *e.g.*, DEs 72–84).  State has discretion on how and when to serve complaints depending on the ebbs and flows of diplomatic relations.  State did not serve the Amended Complaint until almost a year later on January 18, 2023. (DE 85). China responded on February 2, 2023 that it would not respond to the Amended Complaint based on sovereign immunity grounds, and State notified Appellees of the status on March 27, 2023. (DE 85).  Appellees still had to obtain a finding that China would be considered served, so that they could seek default on China, and continue the case.  This process took until October 23, 2023, when the Clerk entered its defaults.  (DE 111).  Next the lower court agreed that briefing on subject matter jurisdiction was required, and although that briefing was completed on February 12, 2024, (DE 127), the Report & Recommendation was not issued until November 25, 2024. (DE 130).  The matter then proceeded through the objection process and the lower court issued its Order adopting in part and denying in part the Report & Recommendation on May 27, 2025, (DE 145), and this appeal shortly followed.

PCIA makes much of the exchanges between undersigned and the district court during two hearings held a month apart in September and October 2023, but

9

the exchanges do not have the import PCIA assigns to them, as this case was in a completely different posture. At the hearing on September 20, 2023, Appellees were seeking the default against the Chinese Government and were unwilling to just summarily dismiss China (and still would be). Undersigned's statements to the district court that the Chinese Government Defendants are a vital part of the allegations was true then, and remains true now. (DE 97, at 5:22-6:10). Appellees have always maintained, and continue to maintain, that China caused the issue of hoarding PPE. That statement about China being a vital part of the allegations does not exclude Appellees' position that China acted as market participant in doing so. (*See* DE 97, at 5:22-6:10). PCIA's implication that undersigned responding affirmatively — "Yes, sir" — to the district court's query that it did not make sense to proceed solely against PCIA is also of no moment. (DE 97, 7:12-17). It did not make sense to Appellees to let the two largest defendants in this action go, after more than three years of fighting to get them served and defaulted. No more should be read into counsel's exchanges with the district court.

At the October 20, 2023 hearing, which is of no more significance, the following exchange occurred:

> THE COURT: ... Let's assume ... I find that the [Chinese Government is] not properly here, have you decided what you do with PetroChina America?
> [COUNSEL]: I have — I would think that we would ***probably*** end this case —
> THE COURT: Understood —

10

[COUNSEL]: — *but I have not* —
THE COURT: —you don't need to say any more.
[COUNSEL]: —*authority* —
THE COURT: *I think I get it*.

(DE 113 at 7:9-20) (emphasis supplied).  Undersigned said "probably" and expressly said he had no authority to make that determination, and the lower court understood. Indeed, the lower court still continued the briefing process. But again, Appellees were not prepared to just let the two main Defendants go after the long process up to that point.  Indeed, as it turned out, it did not have to.

Interestingly, PCIA's counsel, after the above exchange, made clear that they had taken no position as to the lower court's procedural direction on the Chinese Government questions, because they are "representing a different client than the other two entities," and "they are not our clients and we don't want to represent that." (DE 97, at 12:10–18).  At that stage, at least, PCIA appeared to understand it could not properly make arguments on behalf of China, but that changed once the lower court agreed to take the matter further into default of China, and it continues into this appeal.

## C.  Standard of Review.

Appellees agree with PCIA that this Court reviews issues of subject matter jurisdiction under the FSIA *de novo.*

11

**SUMMARY OF THE ARGUMENT**

PCIA is improperly speaking for the Chinese Government in this appeal, and it should not have standing to do so. Its fate is not inextricably linked to whether or not the lower court ruled correctly — there are still direct and separate claims against PCIA, and there are still putative class members to consider. It is important to note that PCIA is not aggrieved by the Order on subject matter jurisdiction — this matter is able to continue without China, and PCIA would have its own opportunity to attack their inclusion in the case — yet PCIA is making an appeal as if it were China, which is improper.

But even if this Court decided that PCIA has standing to speak for China, the district court still ruled correctly in adapting and adopting the reasoning of the Eight Circuit to this substantially similar case. The Chinese Government's actions as to the hoarding of PPE, prior to and against the backdrop of the mushrooming pandemic were separate and apart from allegations of lab leaks and news muzzling; the conduct was commercial market manipulation and had a direct effect in the United States.

# ARGUMENT

## I. PCIA DOES NOT HAVE STANDING TO SPEAK FOR THE CHINESE GOVERNMENT AS TO CHINA'S SOVEREIGN IMMUNITY

### A. It Is Clear Who PCIA Is Arguing For.

PCIA's brief is replete with statements such as "[t]he district court erred in denying sovereign immunity to the Chinese Government . . ."  (Br. at 1); "[t]he Chinese Government is immune here (Br. at 2); and a "[s]traightforward application of the FSIA prevents Plaintiffs from haling the Chinese Government into a United States court on such claims . . .." (Br. at 1).  But it is well understood that one defendant lacks standing to speak for absent or non-moving defendants.  *See*, *e.g.*, *Nix v. NASA Fed. Credit Union*, 200 F. Supp. 3d 578, 585 n.10 (D. Md. 2016) (citing *Mantin v. Broad. Music, Inc.*, 248 F.2d 530, 531 (9th Cir. 1957) (holding that moving defendants lacked standing to seek dismissal of complaint as to non-moving defendants); *Shultz v. Nomac Drilling, L.L.C.*, No. 17-cv-169-R, 2017 U.S. Dist. LEXIS 106564, slip op. at *4 (W.D. Okla. July 11, 2017) ("It is generally accepted that parties lack standing to seek dismissal of parties other than themselves.").

### B. Appellees Did Not Agree to Dismiss PCIA If China Is Found to Be Fully Immune.

The gravamen of *PCIA's* argument is that Appellees said they would drop their claims if there was a finding of sovereign immunity on the claims against

China, and therefore the ruling below (and here) is case dispositive as to them. But that is not what Appellees said below.  Appellees were careful at the last hearing in the district court not to concede that a finding of total sovereign immunity would be case dispositive to all Defendants, and the district court understood Appellees' position ("I think I get it").  (*See* DE 113, 7:20).

PCIA's reliance on *Agudas Chasidei Chabad v. Russian Federation,* is misplaced.  Appellee there, *a non-party*, was trying to avoid the risk of continued litigation after a motion to dismiss was granted without prejudice, and the court recognized that a complete dismissal would foreclose the risk of a new claim against that non-party, and Appellee had the right to seek that dismissal — to end the litigation. *See* 110 F.4th 242, 248 (D.C. Cir. 2024), *cert denied,* No. 24-909, 2026 U.S. LEXIS 442 (U.S., Jan. 20, 2026).  That is not the case here.  PCIA's claims about this decision being case dispositive are speculative at best — Appellees' claims against PCIA may go forward no matter the decision here.

For the same reasons, *Vera v. Banco Bilbao Vizcaya Argentaria, S.A.,* is equally unavailing.  There, a private *non-party* bank was allowed to contest a finding of no sovereign immunity (against Cuba) to prevent an action for execution on its assets that were traceable to Cuba.  *See* 946 F.3d 120, 135 (2d Cir. 2019).  Again, the court's ruling would have ended any litigation against the bank completely, which is not the case here. A favorable ruling here does not redress injury to PCIA.

14

*Cf. Wolff v. Cash 4 Titles*, 351 F.3d 1348, 1353 (11th Cir. 2003) (another case relied upon by PCIA).

Equally misplaced is reliance on cases such as *N.J. Department of Environmental Protection v. American Thermoplastics Corp.* Again, that court was addressing a *non-party*, but also stated that "[a] purely speculative concern about the eventual result of a co-party's case is likewise insufficient," for appellate standing. 974 F.3d 486, 493 (3d Cir. 2020). There, the court determined that the federal government, the non-party, did have an "injury in fact" and that the appellate process could redress "an invasion of a legally protected interest" that was concrete. *See id.* A finding of an exception to sovereign immunity here is not an invasion of PCIA's legally protected interest — it is not, as it has argued strenuously, sovereign. It is also relying on hypothetical and speculative concerns about a co-party's case, namely the speculative statements of Appellees made *three years ago* at an entirely different juncture in the case.

PCIA likewise overstates the findings in *Hendricks v. Bank of America, N.A.*, where the Ninth Circuit said: "To meet our standing requirements for appeal, a defendant must demonstrate that he or she was a party at the time judgment was entered ***and*** [was] aggrieved by the decision being appealed." 408 F.3d 1127, 1133 (9th Cir. 2005) (emphasis supplied) (internal quotation omitted). *Hendricks* concerned a preliminary injunction that affected a letter of credit (LOC) where the

15

appellant (another bank) was a beneficiary of that LOC.  *Id.*  That is not analogous to the claims here, and PCIA is not in a similar position to China, nor is it an aggrieved party.  PCIA will have its opportunity to fight the direct claims against it.

PCIA is relying on speculative statements from three years ago, after Appellees had endured a three-year struggle to sue China, serve China (twice), and to make China responsible for its alleged wrongdoing, and were unwilling to just let China go — do not create injury in fact.  Since that time, Appellees have steadfastly maintained this action against all Defendants and have consistently argued below that PCIA is improperly arguing on behalf of China by attributing meaning to Appellees' speculative statements that does not actually exist.

**C. PCIA's Contention that it Is Aggrieved Is a Chimera.**

PCIA's contention that it is aggrieved is a chimera.  Absent this appeal, the case would be moving forward.  If its appeal succeeds, Appellees may still move forward on their hoarding and anti-trust claims directly against it. Appellees would not be "changing their tune," (Br. at 23); they never sang that song to begin with. Three years ago, Appellees made statements that it considered China vital to the litigation and it was unwilling to let them out of the case, (DE 97, 5:22-6:10), and their counsel also said he had no authority to say it would also dismiss PCIA if there

16

was no subject matter jurisdiction over China.  (DE 113, 7:9–20).[7]  Appellees have

not changed their position "according to the exigencies of the moment," (Br. at 23),

and thus PCIA's reliance on *S. Mills, Inc. v. Nunes,* 586 F. App'x 702, 706 (11th

Cir. 2014), is inapposite.

Arguments PCIA may have for dismissal based on the merits of those non-

FSIA claims against it were not before the magistrate, nor were they before the

district court, and they are not before this Court.  The district court was only

determining subject-matter jurisdiction as to the Chinese Government. PCIA's

further arguments and case law in its Brief all come back to its argument that a ruling

here is wholly dispositive or addresses an "injury in fact," and that is not the case.

The aggrieved parties here are the Chinese Government defendants, who have

chosen not to appear to even fight jurisdiction — even though they have had years

to do so — and PCIA is improperly fighting their fight, not its own.

Indeed, the district court agreed with Appellees that PCIA was not subject to

the FSIA, and that PCIA had

> lodged an "improper Objection on behalf of the non-appearing and
> defaulted Foreign Defendants . . . since **they lack standing** to seek
> dismissal of the Foreign Defendants," Plaintiffs' Response at 3; *see
> also Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[T]his Court has held

---

[7] PCIA's exact arguments about Appellees alleged confirmation to dismiss PCIA if
there was no subject matter jurisdiction as to China, were made below.  If the district
court thought Appellees had been disingenuous, it had ample opportunity to address
it — and did not. Instead, the district court and the magistrate court agreed there was
no standing. (*See* DE 145, n.3)

17

that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.").

(DE 145, n. 3) (emphasis supplied). The district court moved forward because of its obligation, even *sua sponte*, to address subject-matter jurisdiction "whenever it may lacking." (*Id.*) The district court acted out of its obligations, not because of any persuasive argument from PCIA.

The Court should find PCIA has no standing here to be the voice of the willingly-absent Chinese Government.

## II.    THE COMMERCIAL ACTIVITY EXCEPTION APPLIES TO THE CHINESE GOVERNMENT TO ABROGATE SOVEREIGN IMMUNITY RELATED TO PPE HOARDING AND MARKET MANIPULATION.

Should this Court determine that PCIA may make arguments on behalf of the Chinese Government, the findings below as to Counts VI – IX are still correct and should be affirmed.

### A.    PCIA's "Gravamen" Arguments Do Not Apply Here.

Much of PCIA's brief focuses on arguments that Appellees, the magistrate, the district court, and the Eighth Circuit, all improperly determine that the gravamen of the claims against China is PPE hoarding and market manipulation, when it instead must be China's alleged misconduct in allowing the virus to spread.  This argument continues to ignore that the Amended Complaint *is* about PPE hoarding,

18

and how the resulting shortages of PPE harmed Plaintiffs and the putative class members.

First, the Amended Complaint has nine named Plaintiffs, and eight of them expressly allege that the shortage and inability to obtain PPE once the pandemic occurred caused each of them damage and harm. (DE 19, ¶¶ 7–15). Plaintiffs further alleged that "[w]hen PPE is available, it is at highly inflated prices over market rates before the pandemic," and that the "stories are legion in the media that medical providers are having to improvise PPE and re-use PPE that is meant for one time or limited use, or to simply go without proper gear." (DE 19, ¶¶133, 135). As the district court noted and agreed, the magistrate found there were plausible allegations supporting Plaintiffs' allegations regarding PPE hoarding and effects; but Plaintiffs are not yet required to prove them. (*See* DE 145, p. 15).

Second, Plaintiffs alleged that the market manipulation for PPE occurred *prior* to the world knowing the true dangers of COVID-19 and it mushrooming into a pandemic. The magistrate found, and the district court agreed that:

> . . . the Complaint still plausibly alleges that at the time of the alleged hoarding, the world was unaware of the scope of the pandemic. Plaintiffs allege the same theory Missouri brought before the Eighth Circuit — "China leveraged the world's ignorance about COVID-19 by manipulating the worldwide PPE market." (quoting *Bailey*, 90 F.4th at 939); *see also Bailey*, 90 F.4th at 939 ("Missouri's overarching theory is that China leveraged the world's ignorance about COVID- 19. One way it did so was by manipulating the worldwide personal-protective-equipment market. Missouri must still prove it, but it has alleged

19

enough to allow the claim to proceed beyond a jurisdictional dismissal on the pleadings.”

(DE 145, p. 15).  As an example, Plaintiffs pointed to an NBC News report “on the findings of the intelligence arm of the Department of Homeland Security:”

> “We assess the Chinese Government intentionally concealed the severity of COVID-19 from the International community in early January while it stockpiled medical supplies by both increasing imports and decreasing exports,” the May 1 DHS report states.

> “We further assess the Chinese government attempted to hide its actions by denying there were export restrictions and obfuscating and delaying provision of its trade data,” said the four-page analysis.

(DE 19, ¶ 142).  The Amended Complaint is replete with allegations and a focus on the issue of PPE hoarding and market manipulation with China, and that this manipulation caused Plaintiffs and the putative class members harm.

The district court correctly found that “the ‘gravamen’ of Counts VI–IX is that the Plaintiffs were harmed by the Defendants’ ‘commercial activities’—*viz.* the hoarding of the world’s PPE supply.” (DE 145, p. 18 (citing DE 19, ¶ 206)).

PCIA seems to think the “Holy Grail” is found for them in *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27 (2015), a case that both sides here rely on for different reasons.  Let’s be clear: the plaintiff in *Sachs* was arguing for a commercial activity exception because she bought a Eurail pass on the internet in the United States, that was used in Europe, and she was allegedly injured on a train in Austria operated by its state-owned railway (that had zero ties to the U.S.).  *Id.* at

20

29–30.  The plaintiff argued that the act of buying the pass in the U.S. meant that her claim could be based upon a commercial activity in the U.S., and the Supreme Court called that artful framing of allegations.  *Id.* at 29, 36.  "However Sachs frames her suit, the incident in Innsbruck remains at its foundation."  *Id.* at 36.  Simply put, the Supreme Court found that the gravamen of the plaintiffs' complaint was an injury that occurred in Austria while a passenger on an Austrian train; the purchase of the Eurail pass was tenuous and irrelevant for the purposes of FSIA analysis.

That is not the same as here.  Approximately 19 pages of Amended Complaint's 56 pages, have allegations focused on PPE issues and harms. (*See generally*, DE 19). The allegations are not tangential nor are they an "add-on" to try and back into a commercial activity exception.  The details of how the pandemic unfolded are contextual.  As the district court found (and *Bailey*), China was "leveraging ignorance" before the scope of the pandemic was known, and manipulating the market in the U.S. by, for example, buying up supplies in the U.S.  These are distinct and separate acts that also occurred in the U.S. with substantial and direct effect in the U.S.

Appellees are not exhaustively dissecting PCIA's "gravamen" cases, because, as with *Sachs*, they do not carry the weight PCIA ascribes to them. As one more example, in *Saudi Arabia v. Nelson,* 507 U.S. 349 (1993), an American recruited to work in Saudi Arabia and arrested and tortured in Saudi Arabia, attempted to use his

recruitment in the U.S. as way to assert the commercial activity exception. *Id.* at 351–54. But *Nelson* found that the gravamen of the complaint was the torture in Saudi Arabia, and an exercise of police (sovereign) power). *Id.* at 358; 361. It is clear from *Sachs* and *Nelson*, that only a tangential connection to the heart of the complaint will not suffice for the commercial activity exception. The allegations of the Amended Complaint are extensively focused on the commercial activity of Defendants that had a direct effect in the United States, *i.e.*, shortages and price increases of PPE.  The gravamen of Plaintiffs' surviving Counts VI–IX is PPE manipulation, not the "alleged mishandling of information related to the virus." (Br. at 30).  Indeed, Plaintiffs plausibly alleged that the virus was part of China's larger goal of economic manipulation and monetary gain; PPE was the engine since China controlled the market and knew the needs would soon explode into desperation. (*See* DE 19, ¶ 206).  It was not "secondary conduct." (*Cf.* Br. at 32 (citing *Africa Growth Corp. v. Republic of Angola*, No. 21-11136, 2023 U.S. App. LEXIS 12594, slip op. (11th Cir. May 23, 2023)).  The district court did not indulge in a "claim by claim" approach, as discussed in *Sachs*, (Br. at 34), the holistic approach to the Amended Complaint is that it was focused on PPE hoarding and the resulting harms.[8]

---

[8] PCIA claims that there is a "*parens patriae*" aspect to *Bailey* that distinguishes it from these facts.  (Br. at 35).  Even if that is true, the goal of both complaints (and Missouri's was almost a wholesale copy of Plaintiffs') is/was to hold defendants accountable for harms related to PPE hoarding, and for damages to be paid.

22

**B.      Cornering the Market in PPE Is Not a Sovereign Act.**

PCIA next spends a good bit of page length on attempting to convince the Court that stockpiling, market manipulation, and sending people out to buy up PPE can only be a sovereign act.   First, PCIA points to the U.S. Strategic Petroleum Reserve, and claims, without support, that such a stockpile cannot be a private activity and must be sovereign or "the United States could be subject to suit in other countries for harms allegedly arising from its own maintenance of strategic supplies. (Br. at 4).  That is illogical.  In trying to keep an emergency supply of oil, that it buys on the open market, the U.S. is not hoarding nor trying to corner the market, which is what China is accused of.  Private actors stockpile goods they think they may need in emergencies all the time, as is evident by going to Costco before a hurricane, or even by trying to find a case of toilet paper during the pandemic. PCIA asserts that market manipulation could only be conducted by a sovereign and not a private party. (Br. at 27).

PCIA thus ignores one of the most infamous private acts of market manipulation in modern times, as set forth in *Minpeco, S.A. v. Hunt*, 718 F. Supp. 168, 170 (S.D.N.Y. 1989), where the Hunt Brothers had  tried (and failed) to corner

---

Appellees see no analytical difference due to how the damages would be paid (privately or for the people of Missouri).

the silver market in the late 1970s, and caused the collapse of the market.[9] *See generally*, *id; see also*, *United States v. Am. Tel. & Tel. Co*., 552 F. Supp. 131 (D.D.C. 1982) (consent decree ending up in the breakup of the AT&T "Bell" telephone system for antitrust violations). China's scheme to "leverage the ignorance" of the pandemic for economic gain through its dominance in PPE is not market regulation, or protecting its citizenry — it is commercial activity. (Br. at 3, 36–39); (s*ee also* DE 19, ¶¶ 139–55).

### C.    The Commercial Activity Exception Applies to Defendants' Acts

The Chinese Government's wrongful conduct plainly falls under the commercial activity exception of 28 U.S.C. § 1605(a)(2), which provides an exception:

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

*Id.*. China's scheme was principally abroad, thus, as relevant here, the third clause of the commercial-activity exception provides jurisdiction over a foreign state when "the action is based ... upon an act outside the territory of the United States in

---

[9] It is all the more astonishing to argue that a private actor could not "regulate" a market in an age where billionaires race rockets into space and control vast swaths of the economy and tools of everyday life.

24

connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." *Id.*

To invoke jurisdiction under this clause, "(1) the lawsuit must be based upon an act that took place outside the territory of the United States; (2) the act must have been taken in connection with a commercial activity; and (3) the act must have caused a direct effect in the United States." *Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1224 (11th Cir. 2018) (quoting *De Csepel v. Republic of Hungary*, 714 F.3d 591, 598 (D.C. Cir. 2013)) (cleaned up).

### 1.    *This lawsuit is based upon acts that took place outside the United States.*

"[A]t the first step in a commercial-activity-exception case, [courts] must identify the conduct upon which the suit is based." *Devengoechea*, 889 F.3d at 1222 (citing *Sachs*, 577 U.S at 33). The FSIA itself "does not elaborate on the phrase 'based upon.'" *Sachs*, 577 U.S. at 33. The Supreme Court has noted that "the relatively sparse legislative history offers no assistance." *Nelson*, 507 U.S. at 357.

When assessing what act a suit is "based upon," courts consider the lawsuit's "basis" or "foundation." *Id.* (citations omitted). That, in turn, requires courts to look at the "particular conduct" that constitutes the "gravamen" of the suit. *Devengoechea*, 889 F.3d at 1222 (citing *Sachs*, 577 U.S. at 33). "In other words, [courts] focus on the 'core' of the suit—the foreign state's 'acts that actually injured' the plaintiff." *Id.* (quoting *Sachs*, 577 U.S. at 33); *see also* Gravamen, Black's Law

25

Dictionary (11th ed. 2019) (defining "gravamen" as "[t]he substantial point or essence of a claim, grievance, or complaint."). Courts look to the "elements of a claim that, if proven, would entitle a plaintiff to relief." *Nelson*, 507 U.S. at 357. Further, courts compare the plaintiff's "theory of the case" and the facts the plaintiff's "claims turn on" with the act the plaintiff claims lies at the basis of the lawsuit. *Sachs*, 577 U.S. at 35.

To zero in on the gravamen of the case at bar, this lawsuit is based on trade in the mask and PPE market by Defendants, and the harm sustained by Plaintiffs stemming from Defendants' manipulation of the mask and PPE market. No uniquely-governmental activity lies at the foundation of Plaintiffs' claims. (*See* DE 19, ¶¶ 1–6, 24, 26, 53, 141, 154, 155). To the contrary, private companies, independent research laboratories, educational institutions and individual scientists worldwide actively pursue the mask and PPE market. By manipulating this market, Defendants engaged in harmful economic activity that posed a risk to other market participants, including Plaintiffs. When Defendants engaged in improper conduct in this market, Defendants' conduct harmed Plaintiffs and led directly to the claims alleged in this lawsuit. Much of this conduct occurred in China, far from America's shores, and thus indisputably took place "outside the United States." (*Id.*).

The Amended Complaint has nothing whatsoever to do with a complaint based upon quintessential government conduct, such as expropriation, at issue in

numerous reported cases by Appellant. *See, e.g.*, *United States v. Carmack*, 329 U.S. 230, 236–37 (1946); *Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323, 1324 (11th Cir. 2003).

It is not credible to argue that manipulation of the mask and PPE market, where the harm flowed directly from those acts, and provide the foundation of Plaintiffs' claims that, if proven, will entitle Plaintiffs to relief here, do not form the "gravamen" of the lawsuit. (*See* DE 19, ¶¶ 24 (Defendants were market participants), 26 (overarching scheme by Defendants), 53 (manipulating market for masks and PPE after having caused pandemic), 141 (cornered relevant market), and 154 (hoarded masks and PPE leading to unreasonable restraint of trade and monopolization in the PPE market).

### 2.   *The acts were taken in connection with a commercial activity*

Under the FSIA, an activity is "commercial activity" if it is "either a regular course of commercial conduct or a particular commercial transaction or act." *Devengoechea*, 889 F.3d at 1220 (quoting 28 U.S.C. § 1603(d)). To decide whether an activity is commercial, courts look at "whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in 'trade and traffic or commerce.'" *Repub. of Argentina v. Weltover*, 504 U.S. 607, 614 (1992) (quoting Black's Law Dictionary

270 (6th ed. 1990)). Assessing the commercial character of an act "is a question of behavior, not motivation." *Nelson*, 507 U.S. at 360.

A foreign state engages in commercial activity "where it acts in the manner of a private player within the market" or "where it exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns." *Id.* (internal quotation marks omitted). Conversely, "[p]ublic acts ... require sovereign power and thus cannot be performed by a private party." *Beg*, 353 F.3d at 1325 (citing *Weltover*, 504 U.S. at 614–16). Public acts "make use of the state's sovereign authority." *Id.*

As noted in the prior section, expropriation is an example of the exercise of sovereign power. *See, e.g.*, *Carmack*, 329 U.S. at 236–37 (stating that "[t]he power of eminent domain is essential to a sovereign government"); *Beg*, 353 F.3d at 1324. In contrast, engaging in commercial or scientific pursuits are not public acts, even if the general topic touches upon public concern. *See, e.g.*, *Weltover*, 504 U.S. at 614–15 ("[A] contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods.").

Nothing about participating in the mask and PPE market is uniquely or peculiarly sovereign in nature. *See, e.g.*, *Honduras Aircraft Registry, Ltd. v. Gov't of Honduras*, 129 F.3d 543, 548–49 (11th Cir. 1997) (breach of contract to pay for "goods and services"—a "marketplace activity" available to "private persons");

28

*Guevara v. Republic of Peru*, 608 F.3d 1297, 1301 (11th Cir. 2010) ("[T]he oldest American decision recognizing a commercial activities exception to sovereign immunity involved a reward for capture."); *Weltover*, 504 U.S. at 615 (explaining that "[t]he commercial character" of the bonds was "confirmed by the fact that they [were] in almost all respects garden-variety debt instruments[ ]"); *Devengoechea*, 889 F.3d at 1221–22 ("Nothing about [breaching a bailment agreement] is uniquely or peculiarly sovereign in nature."). Defendants here engaged in the marketplace activity of participating in the mask and PPE market—economic activity that can be—and is—conducted by private actors worldwide.

Pfizer, Merck, Moderna and virtually every other pharmaceutical company; Rockefeller University, Lawrence Livermore Laboratories and countless other private research institutions; universities throughout the world; and inventors and scientists in many nations all actively engage in mask and PPE research and development. China cannot transform private, commercial activity into the exercise of sovereign power merely by taking action in the market for masks and PPE, even if they were seeking to promote a public purpose. Courts look to the "behavior, not motivation" behind an act. *Nelson*, 507 U.S. at 360. Participating in the mask and PPE market is the type of action by which a private parties engage in "'trade and traffic or commerce.'" *See Weltover*, 504 U.S. at 614 (quoting Black's Law Dictionary 270 (6th ed. 1990)).

29

### 3.    The acts caused a direct effect in the United States

Under the FSIA, a "direct effect" is one that follows "as an immediate consequence of the defendant's ... activity." *Weltover*, 504 U.S. at 618 (citation omitted). The effect must be more than "purely trivial" or "remote and attenuated," but it need not be a substantial or foreseeable effect. *Id.* In evaluating a "direct effect," courts ask, "[W]as the effect sufficiently 'direct' and sufficiently 'in the United States' that Congress would have wanted an American court to hear the case?" *Guevara*, 608 F.3d at 1309 (quoting *Harris Corp. v. Nat'l Iranian Radio & Television*, 691 F.2d 1344, 1351 (11th Cir. 1982) (internal citation and quotation marks omitted)).

The Supreme Court in *Weltover* explained the meaning of "direct effect." In that case, Argentina and its bank sold bonds to raise United States dollars to repay their foreign debts when they matured. *Weltover*, 504 U.S. at 609–10. The plaintiffs, who had bought some of these bonds, designated New York as the place of payment and sued Argentina when it failed to pay after it unilaterally rescheduled the time for payment. *Id.* at 610. Based on the fact that New York was "the place of performance for Argentina's ultimate contractual obligations," the Supreme Court concluded that Argentina's rescheduling of its obligations to repay the bonds "necessarily had a 'direct effect' in the United States: Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming." *Id*. at 619. The Eleventh

30

Circuit interpreted *Weltover* to stand for the proposition that a "direct effect" occurs in the United States when "monies or goods [are] due in the United States." *Samco Global Arms, Inc. v. Arita*, 395 F.3d 1212, 1217 (11th Cir. 2005).

A "direct effect" in the United States occurred, for example, in a case decided by the District of Columbia Circuit. *De Csepel*, 714 F.3d 591, involved the Herzog Collection, "one of Europe's largest and finest private art collections." *Id.* at 594. During the Holocaust, the Hungarian government, acting in conjunction with Nazi Germany, had seized the Collection from the *de Csepel* plaintiffs' ancestors. *Id.* at 594–95. After World War II ended, the plaintiffs alleged, the Hungarian government reached bailment agreements with them concerning the Herzog Collection. *Id.* at 596. Under the alleged agreements, upon demand, the Hungarian government had "a duty ... to return" the property to the plaintiffs, whom it knew to reside in the United States. *Id.* at 596, 601. When Hungary failed to return the Herzog Collection, the plaintiffs sued for bailment, conversion, constructive trust, accounting, declaratory relief, and restitution based on unjust enrichment. *Id.* at 596.

The District of Columbia Circuit concluded that jurisdiction existed under the third clause of the commercial-activity exception. *Id.* at 601. In reaching this determination, the Court explained that Hungary's refusal to return the property to the plaintiffs in the United States caused the requisite "direct effect" in the United States. *Id.* While the complaint did not expressly allege that the return of the artwork

31

was to take place in the United States, significantly, the court opined that "this is fairly inferred from the complaint's allegations that the bailment contract required specific performance—i.e., return of the property itself—and that this return was to be directed to [the plaintiffs] Hungary knew to be residing in the United States." *Id.*

Here, there has never been a credible suggestion that the harm sustained by Plaintiffs emanated from anywhere other than Defendants' acts. The harm suffered by Plaintiffs was directly caused solely by Defendants' acts—a more direct effect cannot be posited. (*See* DE 19, ₱₱ 154,155 (Plaintiffs' overall harm included death, infection, and other emotional and physical harm, as well as econmic)). As such, Defendants cannot remotely carry their burden to prove the absence of a direct effect on Plaintiffs from Defendants' acts.

### D. *Odyssey Marine* Is Inapposite.

PCIA's reliance on *Odyssey Marine Expl., Inc. v. Unidentified Shipwrecked Vessel*, 657 F.3d 1159, 1177 (11th Cir. 2011), is misplaced. A review of *Odyssey* demonstrates that a court would likely not find the commercial activity exception because the shipwreck at issue was a Spanish Navy vessel, and therefore was a sovereign vessel. *See id.* Moreover, at the time of the sinking it was being used to safeguard passage because of war or threatened war. The case is not on point to Plaintiffs' claims at all; the "private passage" was secondary to the primary use of

32

the vessel as a Navy vessel. Here, the PPE market manipulation was not secondary and it was not sovereign.

## <u>CONCLUSION</u>

The magistrate and the district court considered the arguments presented by Appellant and denied the relief they are seeking in this Court, including the standing to make those arguments.  The decision below, following *Bailey*, should be affirmed by this Court.

Respectfully submitted,

*/s Matthew T. Moore*
Matthew T. Moore, Esq.
Berman Law Group
5801 Congress Avenue
Boca Raton, FL  33487
PH: (561) 826-5200
mmoore@thebermanlawgroup.com

## CERTIFICATE OF COMPLIANCE

This document complies with the with the word limit of Fed. R. App. P. 27(d)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 9090 words.  This document also complies with the requirements of Fed. R. App. P. 32(a)(5) and (6), because it has been prepared using Microsoft Word and a proportionally styled typeface, Times New Roman, 14 point.

February 17, 2026

*/s Matthew T. Moore*
Matthew T. Moore, Esq.


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 17, 2026, I electronically filed the foregoing Initial Brief with the Clerk of Court using CM/ECF. I also certify that the foregoing is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s Matthew T. Moore*
Matthew T. Moore, Esq.