No. 25-12241

# United States Court of Appeals for the Eleventh Circuit

MORIAH AHARON,
JORDAN G. KUPPINGER,
DAMON J. DETESO,
ROSANNA CARUSO,
CHRISTOPHER PAYTON, ET AL.,
*Plaintiffs-Appellees,*

v.

CHINESE COMMUNIST PARTY, ET AL.,
*Defendants,*

PETROCHINA INTERNATIONAL (AMERICA), INC.,
*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Florida, No. 20-cv-80604-RKA

## REPLY BRIEF FOR APPELLANT

Pravin Patel
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131-3368
(305) 577-3180
pravin.patel@weil.com

*Counsel for Appellant PetroChina International (America), Inc.*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, PetroChina International (America), Inc. ("PCIA") states PetroChina International (America), Inc. is not a publicly traded corporation and is wholly owned by its parent company, PetroChina International Co., Ltd, which is also not a publicly traded company.

The undersigned counsel certifies that the following persons have or may have an interest in the outcome of this case or appeal:

1.  Aharon, Moriah - Plaintiff in district court proceedings;

2.  Kuppinger, Jordan G.- Plaintiff in district court proceedings;

3.  Deteso, Damon J. - Plaintiff in district court proceedings;

4.  Caruso, Rosanna - Plaintiff in district court proceedings;

5.  Payton, Christopher - Plaintiff in district court proceedings;

6.  Angioletti, Lee - Plaintiff in district court proceedings;

7.  Manning, Mariangella - Plaintiff in district court proceedings;

8.  Vasquez, Lynnora - Plaintiff in district court proceedings;

9.  Madden, Rebecca - Plaintiff in district court proceedings;

10. The People's Republic of China - Defendant in district court proceedings;

11. The Chinese Communist Party - Defendant in district court proceedings;

12. Altman, Roy K. - United States District Judge, United States

C1 of 2

District Court, Southern District of Florida;

13. Reinhart, Bruce R. - Magistrate Judge, United States District Court, Southern District of Florida;

14. Patel, Pravin R. - Counsel for Defendant-Appellant PetroChina International (America), Inc.;

15. Katzen, Alli G.  - Counsel for Defendant-Appellant Petro-China International (America), Inc.;

16. Weil, Gotshal & Manges LLP - Counsel for Defendant-Appellant PetroChina International (America), Inc.;

17. Moore, Matthew T. - Counsel for Plaintiffs;

18. The Law Offices of Berman & Berman, P.A. - Counsel for Plaintiffs;

19. PetroChina International Co., Ltd - Appellant's parent corporation;

20. PetroChina Company Limited - Appellant's grandparent corporation;

21. China National Petroleum Corporation - Appellant's great grandparent corporation;

22. PetroChina International (Canada) Trading, Ltd. - Appellant's subsidiary corporation; and

23. PetroChina International (Brazil) Trading, Ltda. - Appellant's subsidiary corporation.

# TABLE OF CONTENTS

Introduction ............................................................................................ 1

Argument ............................................................................................... 4

   I.  PCIA Has Appellate Standing ............................................... 4

     A.  The FSIA Order Is Adverse to PCIA's Own Interests ................. 5

     B.  Probabilistic Injury and a Likelihood of Redress Are Enough
        for Appellate Standing ............................................................. 10

  II.  The FSIA Commercial Activity Exception Does Not Apply ............ 13

     A.  The Action is Based Upon China's Sovereign Regulatory
        Response to COVID-19 ............................................................. 14

     B.  The Core Conduct At Issue Constituted Sovereign Acts ........... 17

        1.  Plaintiffs' broad characterization of their allegations does
            not transform sovereign conduct into commercial
            conduct ……………....................................................... 17

        2.  This Court should not follow *Bailey* ..................................... 21

     C.  The Chinese Government's Conduct Did Not Cause a Direct
        Effect in the United States ....................................................... 25

Conclusion ........................................................................................... 29

Certificate of Compliance .................................................................... 30

Certificate of Service ........................................................................... 31

i

# TABLE OF CITATIONS

**Cases**                                                                 **Page(s)**

*Agudas Chasidei Chabad v. Russian Fed'n,*
110 F.4th 242 (D.C. Cir. 2024) ................................................... 11–12

*Missouri ex rel. Bailey v. People's Republic of China,*
90 F.4th 930 (8th Cir. 2024) ........................... 3–4, 21–23, 25–26, 28

*Beg v. Islamic Republic of Pakistan,*
353 F.3d 1323 (11th Cir. 2003) ...................................................... 22

*Broidy Cap. Mgmt., LLC v. Muzin,*
61 F.4th 984 (D.C. Cir. 2023) ........................................................ 13

*Chisholm & Co. v. Bank of Jam.,*
643 F. Supp. 1393 (S.D. Fla. 1986) ............................................... 19

*Cmty. Fin. Grp., Inc. v. Republic of Kenya,*
663 F.3d 977 (8th Cir. 2011) .......................................................... 19

*De Csepel v. Republic of Hungary,*
714 F.3d 591 (D.C. Cir. 2013) ....................................................... 27

*DeRoy v. Carnival Corp.,*
963 F.3d 1302 (11th Cir. 2020) ...................................................... 10

*De Sanchez v. Banco Cent. de Nicar.,*
770 F.2d 1385 (5th Cir. 1985) ........................................................ 20

*Devengoechea v. Bolivarian Republic of Venezuela,*
889 F.3d 1213 (11th Cir. 2018) ........................................... 14, 17, 20

*Edwards v. Country of China,*
2021 WL 4483085 (D.S.C. Aug. 30, 2021) ..................................... 20

*Eisenberg v. People's Republic of China Through Wang,*
2022 WL 1591541 (D. Mass. May 19, 2022) .................................. 20

*Guevara v. Republic of Peru,*
608 F.3d 1297 (11th Cir. 2010) ...................................................... 28

*Hendricks v. Bank of Am., N.A.*,
  408 F.3d 1127 (9th Cir. 2005) ........................................................ 11

*Honduras Aircraft Registry, Ltd.v. Gov't of Honduras*,
  129 F.3d 543 (11th Cir. 1997) ........................................................ 19

*Hosp. Bldg. Co. v. Trs. of Rex Hosp.*,
  425 U.S. 738 (1976) ........................................................................ 7

*Knight v. Alabama*,
  14 F.3d 1534 (11th Cir. 1994) .......................................................... 4

*Laker Airways, Inc. v. British Airways, PLC*,
  182 F.3d 843 (11th Cir. 1999) .......................................................... 6

*Metro. Life Ins. Co., v. Liebowitz*,
  2023 WL 4420366 (11th Cir. July 10, 2023) .................................... 5

*Mezerhane v. Republica Bolivariana de Venezuela*,
  785 F.3d 545 (11th Cir. 2015) .......................................................... 6

*Minpeco, S.A. v. Hunt*,
  718 F. Supp. 168 (S.D.N.Y. 1989) .................................................. 18

*N.J. Dep't of Env't Prot. v. Am. Thermoplastics Corp.*,
  974 F.3d 486 (3d Cir. 2020) ................................................. 6, 11–12

*OBB Personenverkehr AG v. Sachs*,
  577 U.S. 27 (2015) ............................................................. 14–16, 19

*Persinger v. Islamic Republic of Iran*,
  729 F.2d 835 (D.C. Cir. 1984) ................................................. 23–24

*Republic of Argentina v. Weltover, Inc.*,
  504 U.S. 607 (1992) ...................................... 2, 13, 17–18, 20, 25, 27

*Republic of Hungary v. Simon*,
  604 U.S. 115 (2025) ...................................................................... 23

*Robinson v. Tyson Foods, Inc.*,
  595 F.3d 1269 (11th Cir. 2010) ........................................................ 9

iii

*S. Mills, Inc. v. Nunes*,
   586 F. App'x 702 (11th Cir. 2014)......................................................... 9

*United States v. Am. Tel. & Tel. Co.*,
   552 F. Supp. 131 (D.D.C. 1982) .......................................................... 18

*United States v. Pavlenko*,
   921 F.3d 1286 (11th Cir. 2019) .............................................................. 9

*United States v. Weinlein*,
   109 F.4th 91 (2d Cir. 2024)................................................................... 12

*Upton v. Empire of Iran*,
   459 F. Supp. 264 (D.D.C. 1978) .......................................................... 25

*Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*,
   946 F.3d 120 (2d Cir. 2019) ........................................................... 11–12

*Vera v. Republic of Cuba*,
   651 F. App'x 22 (2d Cir. 2016) ............................................................ 13

*Vreeland v. People's Republic of China*,
   2021 WL 1317528 (D.D.C. Apr. 8, 2021) .......................................... 20

*Watson v. Kingdom of Saudi Arabia*,
   159 F.4th 1234 (11th Cir. 2025) .......................................................... 16

*Wolff v. Cash 4 Titles*,
   351 F.3d 1348 (11th Cir. 2003) ......................................................... 3–4

*Wye Oak Tech., Inc. v. Republic of Iraq*,
   109 F.4th 509 (D.C. Cir. 2024).............................................................. 28

*Young v. Grand Canyon Univ., Inc.*,
   980 F.3d 814 (11th Cir. 2020) ............................................................. 26

**Statutes**

28 U.S.C. § 1605(a)(2) ................................................................... 13, 25

42 U.S.C. § 247d-6b ............................................................................ 24

42 U.S.C. § 6234 ....................................................................... 24

**Other Authorities**

Compl., *Missouri v. People's Republic of China*,
2020 WL 1931343 (E.D. Mo. Apr. 21, 2020) .................................... 22

America Hernandez & Alex Lawler, *IEA Announces
Record Oil Stockpile Release Over Iran War Supply
Disruptions*, Reuters (Mar. 11, 2026),
https://www.reuters.com/business/energy/iea-proposes-
largest-ever-oil-release-strategic-reserves-wsj-reports-
2026-03-11/ ...................................................................................... 20

Heather Hollingsworth, *China Sues After Missouri Seeks
to Collect on $25 Billion Court Judgment, Prosecutor
Says*, Associated Press (Dec. 18, 2025),
https://apnews.com/article/china-lawsuit-missouri-
covid-14c127b5f2d8ff4be9af964a6715b74e .................................... 23

Ernest Scheyder & Jarrett Renshaw, *Trump Launches $12
Billion Minerals Stockpile to Counter China*, Reuters
(Feb. 2, 2026),
https://www.reuters.com/world/china/trump-launches-
12-billion-minerals-stockpile-counter-china-bloomberg-
news-2026-02-02/ .............................................................................. 24

*Office of Foreign Litigation*, Dep't of Just. (Mar. 10, 2025),
https://www.justice.gov/civil/office-foreign-litigation ..................... 24

15A Wright & Miller's Federal Practice & Procedure
§ 3902 (3d ed. May 2025) ................................................................ 11

## INTRODUCTION

This case represents an attempt by individual Plaintiffs to hale a foreign sovereign nation into United States court to answer for its sovereign response to a global pandemic.  The Chinese Government did not appear, invoking its claim to sovereign immunity and informing Plaintiffs that it viewed the litigation as "vexatious."  (Doc. 84-1 at 14).[1]  PCIA, an American-based corporation, is an afterthought in the Complaint.  It is mentioned in only a handful of allegations but is now forced along for the ride in a case that would likely end if the Chinese Government were dismissed.

Plaintiffs offer no sound basis to defend the district court's determination that Plaintiffs' claims circumvent the Foreign Sovereign Immunities Act ("FSIA") and may proceed.  They broadly argue that "manipulation" of the PPE market constitutes commercial activity, and therefore the commercial activity exception allows the Sherman Act claims to continue against the Chinese Government—but not the tort claims, although they rely on the same alleged conduct and injuries.

---

[1] Citations to "Doc." refer to the docket number in the district court.  Page references refer to the page number in the header generated by the district court's electronic filing system.  Citations to "Br." and "Op." refer to PCIA's Opening Brief and Plaintiffs' Response in Opposition, respectively.

1

But courts must look at the "particular actions" underlying a suit—not a label like "market manipulation"—in determining whether the commercial activity exception to the FSIA applies. *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992). And the conduct here is obviously sovereign. Sovereigns, not commercial actors, can use the police power to censor, shut down a city, provide government subsidies, control international trade, and create a national stockpile of health-care supplies to protect the public health. The suit is not based on breach of commercial contracts, like in the cases Plaintiffs cite; it is based on a foreign nation's use of uniquely sovereign powers.

The district court independently erred in holding that the alleged conduct had a direct effect in the United States. A direct effect must be an "immediate consequence" of the commercial activity. *Id.* at 618 (citation omitted). But Plaintiffs cannot explain away the many intervening factors between the Chinese Government's alleged conduct and the alleged PPE shortage. For example, before the Chinese Government's alleged hoarding of PPE could have created a shortage in the United States, the demand for PPE must have increased. Demand could only increase once COVID-19 spread throughout the country. And any number of intervening factors could have impacted the spread of COVID-19, including individual fail-

ures to quarantine or follow stay-at-home orders, the imposition of government regulations, and the proliferation of medical treatment, among others. Any purported stockpiling of PPE, therefore, did not immediately cause a shortage. Plaintiffs brush over the lack of a direct effect because they have no defensible response.

Plaintiffs instead argue that PCIA lacks standing to appeal and is attempting to argue on behalf of the Chinese Government. Not so. Had the district court properly granted immunity to the Chinese Government, the claims against PCIA would likely be dismissed, based on Plaintiffs' own admissions. Further, the district court's order eliminates arguments PCIA could raise in favor of dismissal, like the absence of a necessary party or the act of state doctrine. Indeed, if the Court finds that the Chinese Government's conduct was sovereign and protected, the nature of the evidence, arguments, and discovery will all be impacted. For each of those reasons, PCIA is aggrieved by the district court's order. That is all that is required for appellate standing. *See Wolff v. Cash 4 Titles*, 351 F.3d 1348, 1354 (11th Cir. 2003).

The ruling is wrong, and it invites the very kind of reciprocal tit-for-tat the FSIA was enacted to prevent. Plaintiffs ask this Court to follow *Missouri ex rel. Bailey v. People's Republic of China*, 90 F.4th 930 (8th Cir.

3

2024). But in direct response to *Bailey*, China has already sued the Missouri Attorney General's Office in its own courts. And if private plaintiffs could hale China into U.S. courts to answer for its sovereign reaction to the pandemic, nothing would stop plaintiffs in China from haling the United States into Chinese courts to do the same.

This Court should not go down that path. Congress enacted a simple way to avoid such a race to the bottom: to recognize foreign sovereign immunity and to dismiss the claim at the outset. This Court should reverse the district court's ruling on Counts VI–IX.

## ARGUMENT

### I. PCIA Has Appellate Standing

The Parties agree that to demonstrate appellate standing, a litigant need only be "aggrieved by [a] judgment or order." *Wolff*, 351 F.3d at 1354 (citation omitted). "[A] defendant ordinarily has standing to appeal any ruling on the plaintiff's cause of action that is adverse to the defendant's interests." *Knight v. Alabama*, 14 F.3d 1534, 1555 (11th Cir. 1994). PCIA demonstrated in its Opening Brief that it satisfies this standard. *See* Br. 18–28. In response, Plaintiffs contend that PCIA has no interest in the FSIA Order and is speaking on behalf of the Chinese Government. They further argue that PCIA is not aggrieved by the FSIA Order because it will

have other opportunities to fight the claims against it. Both arguments are unavailing.[2]

### A.  The FSIA Order Is Adverse to PCIA's Own Interests

Plaintiffs repeatedly assert that "PCIA is improperly speaking for the Chinese Government."[3]  Op. 12, 16–17.  Not so.  PCIA is a co-defendant advocating for its own interests.  The FSIA Order deprives PCIA of multiple bases to move for dismissal.  *See* Br. 21–24.  And as Plaintiffs recognize, this case would likely end if the Chinese Government were dismissed.

Plaintiffs do not address, much less dispute, the fact that the FSIA Order eliminates or severely undermines various arguments PCIA could raise in seeking dismissal of the claims against it.  *See Metro. Life Ins. Co. v. Liebowitz*, 2023 WL 4420366, at *14 (11th Cir. July 10, 2023) (per curiam) ("When a party fails to address a specific claim, or fails to respond

---

[2] Plaintiffs also argue that the district court made a "finding" that PCIA lacks standing.  Op. 3, 17.  That's wrong.  The court acknowledged that Plaintiffs contested standing but did not hold that PCIA lacked standing in the trial court to oppose Plaintiffs' motion, let alone that PCIA lacked appellate standing to challenge the FSIA Order.  (Doc. 145 at 11 n.3) (finding that it was "obligated to inquire into [its] own subject-matter jurisdiction," notwithstanding Plaintiffs' argument that PCIA "lodged an 'improper objection on behalf of the … Foreign Defendants'" (citation omitted)).

[3] The district court found that PCIA "doesn't meet the statutory definition of an 'agency or instrumentality' [of China] because it's a 'citizen of a State of the United States as defined in section 1332(c) and (e) of [Title 28].'" (Doc. 145 at 10) (second alteration in original).  Plaintiffs have not challenged this holding.

to an argument made by the opposing party, the Court deems such claim or argument abandoned." (citation omitted)).  Deprivation of the ability to request legal relief—or, as the Third Circuit put it, the removal of "a barrier" to relief—is sufficient for appellate standing.  *See N.J. Dep't of Env't Prot. v. Am. Thermoplastics Corp.*, 974 F.3d 486, 494 (3d Cir. 2020).

First, as PCIA argued in its Opening Brief, the FSIA Order deprives PCIA of the opportunity to move to dismiss on the basis that the Chinese Government is an indispensable party.  *See* Br. 24 (citing *Laker Airways, Inc. v. British Airways, PLC*, 182 F.3d 843, 848 (11th Cir. 1999)).  Based on Plaintiffs' repeated representations that the Chinese Government is "a vital part" of their allegations, PCIA could argue that the case cannot proceed without the Chinese Government's presence.  *See* Br. 24.  The FSIA Order's failure to dismiss the Chinese Government prevents PCIA from raising this argument in favor of dismissal.  Plaintiffs have no answer.

Second, the FSIA Order also seriously weakens PCIA's act of state argument.  The act of state doctrine "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *Mezerhane v. Republica Bolivariana de Venezuela,* 785 F.3d 545, 552 (11th Cir. 2015) (citation omitted).  Had the district court properly recognized that China engaged in sovereign—not commercial—conduct in deciding to create a strategic

stockpile, then it would have to determine the validity of those sovereign acts when evaluating Plaintiffs' claims. The act of state doctrine bars that inquiry, but the FSIA Order severely undermines PCIA's ability to raise that defense.

Plaintiffs also ignore that the FSIA Order reshaped the remaining litigation—to PCIA's detriment. For example, because the Chinese Government was not dismissed, the parties will have to seek discovery from a non-appearing sovereign whose conduct underlies almost every allegation in the Complaint. Procuring relevant evidence is thus complicated and potentially unlikely. Moreover, if this Court finds that the Chinese Government's conduct was sovereign, then Plaintiffs will be forced to prove that PCIA is liable for a conspiracy "substantially and adversely affect[ing] interstate commerce"[4] under the Sherman Act even though the sole co-conspirator in the alleged "conspiracy" was already found to have not engaged in commercial conduct. Plaintiffs will also face the more-difficult burden of proving how PCIA possibly "aided and abetted the tortious acts of the" Chinese Government, when the Chinese Government was found to have engaged only in sovereign conduct. (Doc. 19 ¶ 154).

---

[4] *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 743 (1976) (citation omitted).

These harms establish that PCIA will suffer if the FSIA Order is not reversed and are sufficient to confer appellate standing.  Instead of addressing these harms, Plaintiffs seek to distract from them by focusing exclusively on PCIA's separate argument that Plaintiffs repeatedly represented that the claims against PCIA would likely be dismissed if the Chinese Government was immune from suit.  But here too, Plaintiffs' effort to run away from their prior statements fails.

Specifically, Plaintiffs contend that they never committed to dismissing the entire case if the Chinese Government were dismissed.  *See* Op. 13–16.  Their statements in the district court speak for themselves:

- "I don't think that the case can proceed without the [Chinese Government].  [It is] a vital part of our allegations and what we believe happened that caused the pandemic—or caused the issue of hoarding the PPE."  (Doc. 97 at 6:7–10).

- THE COURT: "All right.  Now, you mentioned earlier that the case doesn't really make sense without [the Chinese Government].  Am I understanding what you said correctly?"  PLAINTIFFS: "Yes, sir." (Doc. 97 at 7:8–11).

- When asked how the case would proceed if the court lacked subject matter jurisdiction over the Chinese Government, Plaintiffs answered, "I would think that we would probably end this case." (Doc. 113 at 7:14–15).

In reliance on these representations, the district court explained that it would evaluate a motion to determine if the Chinese Government was

8

immune. And if the Chinese Government was found to be immune, the "case is over." (Doc. 113 at 10:3).

Plaintiffs argue that they did not "concede that a finding of total sovereign immunity would be dispositive as to all Defendants," pointing to the one instance counsel used the qualifier "probably." Op. 11, 14. That is not what the record shows. Over and over again, and across multiple hearings, Plaintiffs' counsel represented that this case cannot proceed without the Chinese Government. And the district court directed proceedings and motion practice based on that representation. Plaintiffs should not be able to reverse course on appeal based on "the exigencies of the moment." *S. Mills, Inc. v. Nunes*, 586 F. App'x 702, 706 (11th Cir. 2014) (per curiam) (citing *Robinson v. Tyson Foods, Inc.*, 595 F.3d 1269, 1273 (11th Cir. 2010)).

At a minimum, even if Plaintiffs resist dismissal on remand, these statements show that Plaintiffs, PCIA, and the district court all agreed the FSIA Order would *likely* end the case or at a minimum significantly alter the remaining litigation in ways that would benefit PCIA. *See United States v. Pavlenko*, 921 F.3d 1286, 1289 (11th Cir. 2019) ("To have appellate standing, a litigant must establish that he has suffered 'a concrete and particularized injury … *likely* to be redressed by a favorable judicial decision.'" (emphasis added) (citation omitted)). Thus, for this additional reason, PCIA has its own interest in reversing the FSIA Order.

Plaintiffs assert that PCIA's position on appeal is equivalent to a defendant seeking dismissal of a complaint on behalf of a non-moving party. *See* Op. 13.  That is wrong for multiple reasons.  None of the cases Plaintiffs cite concern appellate standing, nor are they binding.  More fundamentally, PCIA's appellate standing derives from its own interest in having the Complaint dismissed as to PCIA.  The route to doing so involves correcting the district court's FSIA determination, but that does not amount to a motion filed on behalf of the Chinese Government.  And regardless, federal courts are obligated to ensure they have jurisdiction over the claims before them, irrespective of whether (or which) parties raise the issue.  *See DeRoy v. Carnival Corp.*, 963 F.3d 1302, 1311 (11th Cir. 2020).

Accordingly, PCIA has consistently advocated for its own interest, both in the district court and on appeal, not those of the Chinese Government.  PCIA's interest in this action stems from the harm it will suffer if the FSIA Order is not reversed as to Counts VI–IX.

## B. Probabilistic Injury and a Likelihood of Redress Are Enough for Appellate Standing

Plaintiffs assume that the claims could proceed against PCIA on remand and therefore there can be no appellate standing because a "favorable ruling here does not redress injury to PCIA."  Op. 14.  They further assert that PCIA's injury is "hypothetical and speculative."  Op. 15.  As explained above, those arguments fail to contend with the fact that, if the

FSIA Order were reversed, PCIA could move to dismiss on a variety of bases, which is itself a cognizable and redressable injury for purposes of appellate standing. *Supra* 6–9. But beyond that, Plaintiffs also ignore that appellate standing only requires *probabilistic* injury and a *likelihood* of redress. Br. 19–20, 24–25. Because reversal would permit PCIA to seek dismissal and raise defenses, and because it would likely result in dismissal of the entire case, appellate standing is satisfied.

Courts routinely hold that a litigant has standing to challenge an order entered against another party so long as there is some probability that the order will also affect the litigant. *See, e.g.*, *N.J. Dep't of Env't Prot.*, 974 F.3d at 493–94; *Hendricks v. Bank of Am., N.A.*, 408 F.3d 1127, 1133 (9th Cir. 2005); *see also* 15A Wright & Miller's Federal Practice & Procedure § 3902 (3d ed. May 2025) ("[S]tanding to appeal can be supported by abstract or slight injuries, such as probabilistic injury."). In FSIA cases, a co-defendant can challenge an FSIA immunity determination against a foreign state. *See Agudas Chasidei Chabad v. Russian Fed'n*, 110 F.4th 242, 248 (D.C. Cir. 2024), *cert. denied*, 2026 WL 135737 (U.S. Jan. 20, 2026); *Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*, 946 F.3d 120, 135 (2d Cir. 2019).

Plaintiffs assert that these cases considered the appellate standing of non-parties, whereas PCIA is a co-defendant. *See* Op. 13–15. But that

11

distinction supports PCIA.  A party to a litigation is *more* likely than a non-party to be aggrieved by a district court order.  Plaintiffs argue "PCIA is a named party, not an aggrieved party," Op. 4, but those are not mutually exclusive and, as shown above, PCIA is aggrieved.  *Supra* 5–10.

Next, Plaintiffs assert that the non-parties in *Agudas* and *Vera* had standing because the court's ruling would foreclose future claims against them.  *See* Op. 14–15.  By contrast, Plaintiffs contend that whether this appeal will be dispositive as to PCIA's claims is "speculative at best."  Op. 14.  But this contention misstates the inquiry.  Probabilistic or threatened harm suffices for appellate standing.  *See, e.g.*, *United States v. Weinlein*, 109 F.4th 91, 96–97 (2d Cir. 2024).  Moreover, PCIA is *certain* to suffer harm because the FSIA Order forecloses or severely undermines arguments it could raise in favor of dismissal.  *Supra* 6–7.  These harms are sufficient to confer PCIA appellate standing.

Finally, PCIA is not deprived of appellate standing because there are other bases on which it *could* challenge Plaintiffs' claims against it, such as a lack of personal jurisdiction or failure to state a claim.  *See* Op. 16.  That will virtually always be the case.  PCIA has shown that reversal of the FSIA Order will remove "a barrier" PCIA faces in obtaining relief.  *See N.J. Dep't of Env't Prot.*, 974 F.3d at 494.  No more is required.  In fact, courts have found that parties should appeal FSIA issues, even regarding

12

a separate sovereign's immunity, early in the litigation. *See Vera v. Republic of Cuba*, 651 F. App'x 22, 25 (2d Cir. 2016); *Broidy Cap. Mgmt. LLC v. Muzin*, 61 F.4th 984, 994 (D.C. Cir. 2023) ("Immunity is a threshold issue which … should be resolved 'as early in the litigation as possible.'" (citation omitted)). The Court should resolve the FSIA issue at this early stage, regardless of the future arguments the Parties may make.

In sum, PCIA need only show that it was aggrieved by the FSIA Order and reversal is likely to redress that injury. PCIA satisfies that because (1) PCIA's arguments in favor of dismissal will be foreclosed or severely undermined, and (2) Plaintiffs' claims will likely be dismissed if the Chinese Government is found to be immune from suit. PCIA therefore has appellate standing.

## II.   The FSIA Commercial Activity Exception Does Not Apply

Plaintiffs agree that only the third clause in the FSIA's commercial activity exception is potentially applicable to the claims against the Chinese Government. Op. 24–25. That exception applies when the action is "(1) 'based … upon an act outside the territory of the United States'; (2) that was taken 'in connection with a commercial activity' of [the Chinese Government] outside this country; and (3) that 'caused a direct effect in the United States.'" *Weltover*, 504 U.S. at 611 (quoting 28 U.S.C. § 1605(a)(2)).

13

Plaintiffs, however, argue that the district court correctly identified the gravamen of the Sherman Act claims (Counts VI–IX) to be the Chinese Government's alleged "PPE hoarding and market manipulation" rather than the conduct that "allow[ed] the virus to spread." Op. 18, 20. They then argue that "manipulation of the mask and PPE market" is commercial conduct. Op. 26–29. As explained below, Plaintiffs' arguments ignore that the real gravamen of the suit is the Chinese Government's regulatory response to COVID-19, which allegedly caused the virus to spread. But even assuming that "PPE hoarding" is the gravamen of the suit, the actual conduct alleged to constitute "manipulation of the" market—like providing government subsidies, controlling trade logs, directing public health, and creating a national reserve—was purely sovereign.

### A. The Action is Based Upon China's Sovereign Regulatory Response to COVID-19

The Parties agree that the first step in determining whether the commercial activity exception applies involves identifying "the conduct upon which the suit is based." *Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1222 (11th Cir. 2018). To determine the gravamen of the complaint, the Supreme Court has focused on the nature of the entire suit rather than each individual claim. *See OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35–36 (2015). Plaintiffs agree that *Sachs*'s gravamen analysis governs. *See, e.g.*, Op. 26 ("To zero in on the *gravamen of the*

*case*…." (emphasis added)).  But they incorrectly conclude that the Court should split up the tort and Sherman Act claims and find that the gravamen of the Sherman Act claims is so-called "PPE hoarding."  Op. 18–22.

That's wrong.  The gravamen of the suit is how the Chinese Government's alleged regulatory response to COVID-19 caused "actual injury" to Plaintiffs through damages stemming from the contraction or fear of contracting the virus.  According to Plaintiffs, the Chinese Government allegedly caused this injury by concealing the existence and subsequent spread of COVID-19, censoring medical professionals and public officials, misleading the World Health Organization, commencing a citywide lockdown in Wuhan, facilitating massive public gatherings and travel from Wuhan, and creating a strategic national stockpile of PPE, all of which Plaintiffs contend caused approximately 95% of COVID-19 cases.  (*See* Doc. 19 ¶¶ 54–113, 116–21, 123, 139–54).

The district court, however, did not analyze the gravamen of the suit holistically.  Instead, it examined the gravamen of the tort allegations in Counts I–V separately from the Sherman Act claims in Counts VI–IX. (*See* Doc. 145 at 17–18).  This error led the district court to view Plaintiffs' PPE hoarding allegations independently from the Chinese Government's overarching regulatory response to the COVID-19 pandemic.  (*See* Doc. 145 at 18 (discussing the PPE hoarding allegations as acts of a "private

15

player")).  But these acts must be analyzed within the appropriate context. *See* Op. 12 (explaining that the PPE hoarding allegations arise "against the backdrop of the" COVID-19 pandemic).  Properly understood, Plaintiffs' allegations describe harm from the Chinese Government's continuing regulatory response to the COVID-19 outbreak.

Therefore, the entirety of the lawsuit is based on the same course of conduct: a sovereign nation's management of a novel virus.  The district court held that the commercial activity exception did not apply to claims based on that conduct, and Plaintiffs have not challenged that holding on appeal.  (Doc. 145 at 27–30).  So if the gravamen of the suit as a whole is found to be the Chinese Government's "alleged failure to 'take adequate steps to raise awareness about—and to prevent—the spread of COVID-19,'" then the FSIA Order must be reversed as to Counts VI–IX.[5]  (Doc. 145 at 27 (citation omitted)).

---

[5] In different circumstances, this Court indicated that a claim-by-claim analysis may be appropriate.  *See Watson v. Kingdom of Saudi Arabia*, 159 F.4th 1234, 1250 n.2 (11th Cir. 2025).  *Watson* does not apply here, where "the gravamen of each claim is found in the same place," namely, in the Chinese Government's alleged overseas conduct in managing COVID-19 and stockpiling PPE.  *Sachs*, 577 U.S. at 36 n.2.

### B.   The Core Conduct At Issue Constituted Sovereign Acts

Even if the Sherman Act claims in Counts VI–IX are considered in isolation and found to be based upon so-called PPE "hoarding," that conduct still qualifies as sovereign conduct covered by the FSIA.  Br. 39–46.

The Parties agree that, under the FSIA, a foreign state engages in commercial activity when it "does not exercise powers peculiar to sovereigns" but instead "exercises only those powers that can also be exercised by private citizens."  *Devengoechea*, 889 F.3d at 1221 (quoting *Weltover*, 504 U.S. at 614).  That was not the case here.

#### 1.   Plaintiffs' broad characterization of their allegations does not transform sovereign conduct into commercial conduct

Seeking to characterize their allegations as commercial, Plaintiffs describe the conduct underlying the Sherman Act claims in the broadest possible terms.  They label the conduct as "market manipulation" and claim the Chinese Government: "hoard[ed] … the world's PPE supply," "manipulat[ed] … the mask and PPE market"; "trade[d] in the mask and PPE market"; "engag[ed] in the marketplace activity of participating in the mask and PPE market"; and "t[ook] action in the market for masks and PPE." Op. 20, 23–24, 26–29.  This activity, Plaintiffs contend, is "economic activity that can be—and is—conducted by private actors worldwide."  Op. 29.  Then, citing two out-of-circuit, non-FSIA cases where private parties were liable for conduct amounting to market manipulation, Plaintiffs

make the leap that market-manipulation claims inherently involve commercial activity and can never be characterized as being based on sovereign conduct.  *See* Op. 23–24 (first citing, *S.A. v. Hunt*, 718 F. Supp. 168, 170 (S.D.N.Y. 1989); and then citing *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131 (D.D.C. 1982)).

Plaintiffs' argument conflates the merits of a market-manipulation claim with the jurisdictional analysis.  The question is not whether the relevant conduct may theoretically give rise to an antitrust violation.  Rather, the question is whether the particular actions underlying Plaintiffs' claims are sovereign or commercial in nature.  The fact that private parties have been liable for conduct amounting to "market manipulation" in prior cases does not mean the Sherman Act claims here are necessarily based upon commercial conduct that private parties engage in.

Moreover, Plaintiffs' reliance on the label "market manipulation" ignores the well-settled rule that courts must look at the "*particular actions*" that the state performed to determine if the claims are based on sovereign conduct.  *Weltover*, 504 U.S. at 614 (emphasis added).  The cases Plaintiffs cite—*Minpeco* and *American Telephone*—involve market manipulation by private parties and are inapposite under the proper framework because those cases did not include anything akin to the *particular actions* the Chinese Government allegedly engaged in here, such as blocking exports from

18

Chinese factories, concealing national trade logs, providing government subsidies for PPE manufacturing, and leveraging China's so-called Military-Civil-Fusion national strategy.  (Doc. 19 ¶¶ 124, 140–41, 143–48, 150).

Thus, Plaintiffs' intentionally broad framing of their allegations as "market manipulation" falls flat; the particular actions at issue are uniquely sovereign.  *Cf. Sachs*, 577 U.S. at 36 (rejecting plaintiff's arguments that "would allow plaintiffs to evade the [FSIA's] restrictions through artful pleading").  "The regulation of imports and exports is a sovereign prerogative."  *Chisholm & Co. v. Bank of Jam.*, 643 F. Supp. 1393, 1401 (S.D. Fla. 1986); *Cmty. Fin. Grp., Inc. v. Republic of Kenya*, 663 F.3d 977, 981 (8th Cir. 2011) ("The decisions regarding whether or how to … regulate exports … [is] [a] governmental rather than commercial activit[y].").  And the concealment of trade logs, government subsidizing of manufacturing, and use of Military-Civil Fusion are not actions where "[a]ny party, sovereign or not, could" perform the alleged conduct.  *Honduras Aircraft Registry, Ltd. v. Gov't of Honduras*, 129 F.3d 543, 548 (11th Cir. 1997).

At bottom, Plaintiffs accuse the Chinese Government of nothing more than creating a strategic national stockpile of medical equipment—a practice that multiple countries, including the United States, also follow.

Courts routinely classify these actions as sovereign conduct.  *See, e.g., Eisenberg v. People's Republic of China Through Wang,* 2022 WL 1591541, at *5 (D. Mass. May 19, 2022); *Vreeland v. People's Republic of China,* 2021 WL 1317528, at *2 (D.D.C. Apr. 8, 2021); *Edwards v. Country of China,* 2021 WL 4483085, at *3 (D.S.C. Aug. 30, 2021).  In other contexts, too, the governmental "control and management" of national reserves of resources qualifies as sovereign conduct.  *de Sanchez v. Banco Cent. de Nicar.,* 770 F.2d 1385, 1393 (5th Cir. 1985).[6]  Therefore, Plaintiffs' own allegations confirm that the Chinese Government was engaging in sovereign conduct by creating a national stockpile.  (*See, e.g.,* Doc. 19 ¶ 149).  The label "hoarding" changes nothing.

For these reasons, Plaintiffs' other attempts to analogize these acts to those of a private player in the market also fail.  The Chinese Government's use of state power is not analogous to a situation in which a sovereign enters "[a] contract to buy army boots" or breaches a bailment agreement.  *See* Op. 28–29 (first citing *Weltover,* 504 U.S. at 614–15; and then citing *Devengoechea,* 889 F.3d at 1221–22).  The claims here do not derive

---

[6] For example, the United States maintains a Strategic Petroleum Reserve in which it stockpiles oil.  *See* America Hernandez & Alex Lawler, *IEA Announces Record Oil Stockpile Release Over Iran War Supply Disruptions,* Reuters (Mar. 11, 2026), https://www.reuters.com/business/energy/iea-proposes-largest-ever-oil-release-strategic-reserves-wsj-reports-2026-03-11/.

from a commercial contract at all; they derive from the Chinese Government's discretion in controlling international trade relations and government subsidies.

In sum, Plaintiffs do not—and cannot—provide any meaningful response for how the specific conduct they allege the Chinese Government engaged in could be performed by a private actor. That the Chinese Government's conduct allegedly contributed to a PPE shortage does not transform otherwise sovereign activity into private conduct. None of Plaintiffs' arguments counsel otherwise.

### 2.  This Court should not follow *Bailey*

Plaintiffs rely heavily on *Bailey*, 90 F.4th 930—which they claim is a "wholesale copy" of this suit—for its determination that PPE hoarding can constitute commercial activity. *See* Op. 19–21, 22 n.8. Such reliance is misplaced. *Bailey* is readily distinguishable. Regardless, it is unpersuasive, and this Court should follow the dissent, not the panel majority.

In *Bailey*, a divided Eighth Circuit analyzed the complaint on a claim-by-claim basis, ultimately concluding that PPE hoarding allegations constituted commercial activity that resulted in a direct effect in the United States. *See Bailey*, 90 F.4th at 938. But in doing so, the court failed to recognize the sovereign nature of allegations that China "'took over factories' … which essentially halted the export" of PPE to the United States.

21

*Id.* at 938 (alteration adopted); *see also Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323, 1326 (11th Cir. 2003) ("Confiscation of real property is a public act because private actors are not allowed to engage in 'takings' in the manner that governments are."). The Court also overlooked that building a stockpile of medical equipment to protect public health is sovereign—not commercial—activity. *Bailey*, 90 F.4th at 938. Then, the court found that these acts led to an "immediate [PPE] shortage in Missouri." *Id.*

Even if *Bailey* were correctly decided, Plaintiffs ignore its distinguishing features. The allegations in *Bailey* did not include critical sovereign conduct that Plaintiffs alleged here. *See* Br. 35 (citing Compl., *Missouri v. People's Republic of China*, 2020 WL 1931343 (E.D. Mo. Apr. 21, 2020)). For example, the complaint in *Bailey* did not contain allegations that the Chinese Government concealed trade logs. Nor did Missouri allege that the Chinese Government invoked its Military-Civil Fusion to hoard PPE equipment.[7] *See* Br. 35. Thus, the facts alleged here provide a greater

---

[7] *Bailey* did include the allegations that the Chinese Government "[took] over mask-producing factories." *Bailey*, 90 F.4th at 938. As the district court recognized, such activity constitutes the exercise of sovereign power. (Doc. 145 at 19) ("The confiscation of private land … [is] obviously [a] sovereign act[ ]."). So, if anything, the cases' overlap in allegations as to government control of factories *supports* a conclusion that the core conduct at issue consisted of sovereign conduct.

basis to conclude that the Chinese Government's acts were not commercial activity.[8]

Moreover, the fallout from *Bailey* concretely demonstrates how the district court's ruling there and in this case frustrates the FSIA's purpose. After the decision in *Bailey*, the district court entered a default judgment awarding Missouri over $25 billion in damages.[9]  In response, China sued Missouri in the Intermediate People's Court of Wuhan, seeking a public apology and over $50 billion in compensatory damages.

The FSIA, and the restrictive theory of sovereign immunity it codified, was intended to prevent this type of tension and retaliation between nations.  *See Republic of Hungary v. Simon*, 604 U.S. 115, 133 (2025) ("The Government represents that this would invite the very risk it sought to avoid in helping draft [the FSIA]: that foreign states, in response, will subject the United States abroad to 'retaliatory or reciprocal actions' in their courts.").  In fact, "some foreign states base their sovereign immunity decision on reciprocity." *Persinger v. Islamic Republic of Iran*, 729 F.2d 835,

---

[8] Moreover, *Bailey* was a *parens patriae* suit between two sovereigns.  It was thus fundamentally different in nature and policy than a suit brought by individuals seeking damages from a sovereign nation for its public health decisions.

[9] Heather Hollingsworth, *China Sues After Missouri Seeks to Collect on $25 Billion Court Judgment, Prosecutor Says*, Associated Press (Dec. 18, 2025), https://apnews.com/article/china-lawsuit-missouri-covid-14c127b5f2d8ff4be9af964a6715b74e.

841 (D.C. Cir. 1984). And at any given time, lawyers are representing the United States in "approximately 1,800 lawsuits pending in the courts of over 160 countries."[10] By providing sovereign immunity to the Chinese Government consistent with existing doctrine, this Court will avoid fueling the significant foreign policy concerns that the United States would face if it was subjected to similar suits abroad.

Finally, the conduct at issue here illustrates the FSIA Order's dangerous consequences. The United States itself maintains strategic stockpiles of materials—including PPE, oil, and minerals.[11] *See* 42 U.S.C. § 247d-6b (Strategic National Stockpile of PPE); 42 U.S.C. § 6234 (Strategic Petroleum Reserve). The district court's ruling suggests any of those efforts could be recharacterized as commercial activity, thus circumventing sovereign immunity. Consider COVID-19 itself: The United States purchased millions of doses of COVID vaccines before they were authorized as part of Operation Warp Speed. Individuals in other nations could easily claim that conduct limited supply in other countries and caused them to contract or fear contracting COVID-19. Under Plaintiffs' theory and the district

---

[10] *See Office of Foreign Litigation*, Dep't of Just. (Mar. 10, 2025), https://www.justice.gov/civil/office-foreign-litigation.

[11] Ernest Scheyder & Jarrett Renshaw, *Trump Launches $12 Billion Minerals Stockpile to Counter China*, Reuters (Feb. 2, 2026), https://www.reuters.com/world/china/trump-launches-12-billion-minerals-stockpile-counter-china-bloomberg-news-2026-02-02/.

court's ruling, the United States could be haled into courts worldwide for any of this activity simply by labeling it "hoarding."

In sum, neither Plaintiffs' reliance on *Bailey*, nor any of their other arguments, compel a finding that the Chinese Government was acting as a private player in the marketplace.  It was acting as a sovereign.

## C.  The Chinese Government's Conduct Did Not Cause a Direct Effect in the United States

Plaintiffs also failed to demonstrate that the Chinese Government's actions caused "a direct effect in the United States."   28 U.S.C. § 1605(a)(2).  Both Parties agree that under the FSIA, "an effect is 'direct' if it follows 'as an *immediate consequence* of the defendant's … activity.'"  *Weltover*, 504 U.S. at 618 (emphasis added) (citation omitted).  "The common sense interpretation of a 'direct effect' is one which has no intervening element."  *Upton v. Empire of Iran*, 459 F. Supp. 264, 266 (D.D.C. 1978), *aff'd*, 607 F.2d 494 (D.C. Cir. 1979).  Plaintiffs failed to allege that the Chinese Government's conduct caused a direct effect in the United States, regardless of whether this Court views the relevant gravamen as the alleged mishandling of COVID-19 or solely the PPE hoarding allegations.  Br. 49–53.  In either scenario, the direct effect is the harm Plaintiffs allege that they suffered—namely, death, infection, emotional and physical harm, and resulting economic damages.  Op. 32.  These damages could have only occurred as a result of COVID-19 spreading throughout the United States,

25

so the spread of COVID-19 and all its various causes are intervening forces.

Plaintiffs have no answer. They spend only three sentences on whether the Chinese Government's conduct caused a direct effect in the United States—the issue both the district court and the Eighth Circuit in *Bailey* described as a "close call." (*See* Doc. 145 at 21) (alterations adopted) (quoting *Bailey*, 90 F.4th at 938). Without any analysis, Plaintiffs offer the conclusory remark that "[t]he harm suffered by Plaintiffs was directly caused solely by Defendants' acts—a more direct effect cannot be posited." Op. 32. Notably absent from this discussion is any response to the numerous intervening factors PCIA identified in its Opening Brief. *See* Br. 49–55. Plaintiffs thus forfeited any argument they may have as to why the innumerable intervening acts do not foreclose the finding of a direct effect. *See Young v. Grand Canyon Univ., Inc.*, 980 F.3d 814, 821 n.4 (11th Cir. 2020).

Plaintiffs in fact implicitly acknowledge the existence of intervening elements. Focusing specifically on the PPE-related allegations, Plaintiffs repeatedly mention that the Chinese Government began stockpiling PPE *before* the COVID-19 outbreak. *See* Op. 12, 19. Necessarily then, the spread of COVID-19 itself was an intervening factor between PPE stock-

26

piling and Plaintiffs' harm.  Within the spread of COVID-19 are innumerable intervening factors, including individuals' travel, government responses to the COVID-19 outbreak, and the proliferation of medical treatment, among other things that contributed to the virus's spread.  That same analysis applies if the Court considers the Chinese Government's sovereign response to the COVID-19 pandemic—to have a direct effect in the United States, COVID-19 must have arrived there through the independent acts of third parties.  Thus, no matter how broadly the Court construes the Chinese Government's conduct, the intervening factors leading to the spread of COVID-19 foreclose any argument that such conduct had a direct effect in the United States.

Plaintiffs cite two cases, without any accompanying analysis, to support their argument.  *See* Op. 30–32.  First, they point to *Weltover*, where Argentina's unilateral rescheduling of a bond payment directly affected the United States because the money was supposed to be paid in New York.  504 U.S. at 619.  Second, Plaintiffs cite *de Csepel v. Republic of Hungary*, where the Hungarian government failed to return artwork to the United States as required under a bailment contract.  714 F.3d 591, 598 (D.C. Cir. 2013).  These cases undermine Plaintiffs' argument.  Both *Weltover* and *de Csepel* involved contracts that specifically provided for performance in the United States.  All relevant conduct—in those cases, contract

27

breaches—unavoidably and immediately caused an effect in the United States because the promised performance did not occur there. There were none of the individual acts, decisions, overseas travel, and physical movement that the chain of events in the current case involves. Such acts, including individuals choosing to "fly back to the United States" from the relevant nation and then take additional actions within the United States, defeat a finding of "direct effect." *Wye Oak Tech., Inc. v. Republic of Iraq*, 109 F.4th 509, 519 (D.C. Cir. 2024).

Chief Judge Smith's partial dissent in *Bailey* is instructive. He relied on Eleventh Circuit precedent that asks the question: were the effects of the sovereign nation's conduct "sufficiently *direct* and sufficiently *in the United States* that Congress would have wanted an American court to hear the case?" *Bailey*, 90 F.4th at 941 (Smith, C.J., dissenting in part) (quoting *Guevara v. Republic of Peru*, 608 F.3d 1297, 1309 (11th Cir. 2010)). He found that the so-called PPE "hoarding" did not have a direct effect in the United States because "the effect of hoarding would have manifested only over time with the spread of COVID-19 *and* resulting consumption of and need for PPE." *Id.* In other words, the "ripple effects that [the plaintiff] complain[ed] of occurred at the end of a long chain of causation." *Id.* (cleaned up).

28

In sum, the commercial activity exception to the FSIA does not apply. Plaintiffs' claims are based upon the Chinese Government's sovereign conduct, even if the Court considers the PPE hoarding allegations separately. Moreover, none of Plaintiffs' allegations about the Chinese Government's conduct had a direct effect in the United States. This Court should reverse the district court's decision.[12]

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's Order.

Respectfully submitted,

/s/ Pravin Patel

Pravin Patel
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
(305) 577-3180
pravin.patel@weil.com

April 13, 2026

---

[12] As PCIA previously noted, the FSIA Order did not concern personal jurisdiction.  Br. 55 n.11 (citing Doc. 112 at 1).  Accordingly, PCIA preserved its personal jurisdiction arguments and does not waive those rights in this appeal.  Br. 55 n.11.

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record certifies pursuant to Fed. R. App. P. 32(g) that the Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii) because, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f), this document contains 6,493 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Century Schoolbook font in 14 point size.

*/s/ Pravin Patel*

Pravin Patel
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
(305) 577-3180
pravin.patel@weil.com

April 13, 2026

# CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2026, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of such filing to all ECF participants.

/s/ Pravin Patel

Pravin Patel
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
(305) 577-3180
pravin.patel@weil.com

April 13, 2026

31